# Southern Railway Co. *v.* Mitchell.

*Action to recover License Tax paid for keeping and operating Toll Bridge.*

1. *Constitutional law; general revenue bill; title no part of such bill.*—A general revenue bill, introduced in the legislature, and providing for the raising of revenue for the State, being excepted from the provisions of Article II, § IV of the Constitution of 1875, (Const. 1901, § 45), which provides that "each law shall contain but one subject which shall be clearly expressed in its title," the title of which such general revenue bill bears on its introduction, is no part of the bill, and the purpose of the bill must be found from the bill itself, wholly apart from the caption under which it is written; and it is competent to embody in such bill any and all provisions for the raising of·revenue, or which may be pertinent or germane thereto, whether expressed in or covered by the title or not.

2. *Constitutional law; when substitute for bill on its passage not a departure; act to further amend the revenue laws.*—House Bill, 1247, which was introduced in the House of Representatives of the Legislature of 1900-1901, entitled an act "to provide for the more efficient assessment and collection of taxes and licenses in the State of Alabama," being a general revenue bill, and its provisions having the necessary effect to amend existing revenue laws of the State, its general purpose would not be changed by a bill introduced as a substitute for it, while it was on its passage, entitled an act "to further amend the revenue laws of the State," such substitute relating to the same subject, providing for the levy, assessment and collection of taxes, and intended for the purpose of raising revenue, and being amendatory of the existing revenue laws.· Therefore, the passage of the substitute by the General Assembly was not in violation of section 9, Article IV of the Constitution of 1875, (Const. 1901, § 61), prohibiting changing on its passage the original purpose of a bill.

3. *License on toll bridge; how amount ascertained.*—Under the

provisions of subdivision 38, section 17 of the act approved March 5, 1901, "to further amend the revenue laws of the State of Alabama," (Acts of 1900-1901, p. 2598), providing for license taxes on toll bridges, a toll bridge which spans a river, which is the boundary line between two counties, and is within two miles of a city of five thousand inhabitants, and also within two miles of a city having between two thousand and five thousand inhabitants, is subject to a license tax to the State in the sum of seventy-five dollars, as fixed by said provisions of said act, by reason of its being within two miles of a city of five thousand inhabitants or more; and the fact that such bridge is partly in each of the two counties, does not, in any way, affect the amount of the license tax ·to be paid.

4. *Same; same.*—In such a case the amount of the license tax to be paid on the toll bridge is not affected by reason of the fact that the license tax to be paid to the county is a percentage upon the State tax collected in such county; such percentage that is collected for the county tax being determined by the per cent. of the State taxes fixed for the county in which said license tax for the toll bridge is paid.

5. *License tax on toll bridge; fact of bridge used by railroad immaterial.*—The fact that a toll bridge has superimposed upon it a railroad bridge, constitutes no reason why the owners of such toll bridge should not pay a license tax for operating the toll bridge as provided by statute; such license tax not being imposed upon the bridge as property.

6. *Same; same.*—Where a toll bridge, used for the passage of vehicles and animals has built upon its top a railroad bridge, the fact that such toll bridge is a part of the structure which carries trains engaged in interstate commerce, constitutes no reason for the owners of such bridge not paying a license tax upon the business of keeping a toll bridge; nor is the fact that such bridge is on the right-of-way of a railroad any reason why the license tax should not be paid.

7. *Corporation; when does not acquire right to carry on business of another corporation by purchase of latter's property.*—A corporation having no authority under its charter to acquire and exercise the rights, powers and franchises of another corporation, or to carry on the business of such corporation, does not succeed to such rights, powers and franchises by purchasing the property of the other company, though it be the whole of such property employed by that company in carrying on the business it was chartered to engage in.

APPEAL from the Circuit Court of Lauderdale.

Tried before the Hon. ED. B. ALMON.

This was an action brought by the appellant, the Southern Railway Company, a corporation, organized under the laws of the State of Virginia, against the appellee, J. J. Mitchell, as an individual, and as Judge of Probate of Lauderdale county; and sought to recover $113.50, money paid by appellant to said Mitchell as a license tax for operating a toll bridge that spans the Tennesse river between the counties of Colbert and Lauderdale; it being averred in one of the two counts of the complaint that said license was paid under protest.

The defendant pleaded the general issue, and the cause was tried by the court without the intervention of a jury upon an agreed statement of facts, which was as follows: "The plaintiff acquired ownership of the bridge across the Tennessee river at Florence, Alabama, known as the Florence Bridge, by purchase under decree of foreclosure of a mortgage executed by the Memphis & Charleston Railroad Company to the Farmers' Loan & Trust Company, the said sale and purchase having been made the 28th day of February, 1898, and was duly confirmed by the United States Court in which the proceeding was instituted, on the 28th day of February, 1898, and the plaintiff was put in possession of the property. The mortgage under which this sale was authorized by the charter of the Memphis & Charleston Railroad Company, included its road-bed, right of way, rolling stock and all other real and personal property, also its franchise and charter. All of this property and right of property was purchased and acquired by the plaintiff at the said sale under said decree of foreclosure. One of the franchise rights conferred by the charter of the Memphis & Charleston Railroad Company is the following: 'Section 23. The said company may purchase, have and hold any bridge or turnpike road over which it may be necessary to carry the said railroad, and when said purchase is made, to hold the said bridge or turnpike road on the same terms and with all the rights which belong to the individual, individuals or corporations from which such purchase may be made: Provi-

ded that the said company shall not obstruct any public
road without constructing another as convenient as may
be.' Under the chartered rights and privileges conferred
upon the Memphis & Charleston Railroad Company by
this section of its original charter in the construction of
its road from Tuscumbia, Ala., to Florence, Ala., it pur-
chased from a corporation, known as the Florence Bridge
Company, about the year 1856, what remained of the
bridge of the said Florence Bridge Company, which had
formerly been constructed by it across the Tennessee
river at that point. What remained at that time of the
bridge of the Florence Bridge Company, were the abut-
ments and a number of stone piers in the river, the su-
perstructure of the bridge being gone, having been
blown away and destroyed by the elements. The Mem-
phis & Charleston Railroad Company, after this pur-
chase of these piers or abutments and the franchise of
the old Florence Bridge Company, erected the present
bridge on the same site across the river at Florence,
erecting it on the said abutments and old piers and on
new piers which said Memphis & Charleston Railroad
Company erected, putting a new pier between each of
the old piers, and for the convenience of the persons de-
siring to cross the river on foot or in vehicles, built the
said thoroughfare portion as part of it. Said bridge
was and is constructed as follows: Upon piers and abut-
ments as aforesaid, the upper portion of said bridge con-
stituting a part of the plaintiff's line of railroad, on
which its tracks are laid for the running of its trains
from one side of said river to the other, and immedi-
ately underneath said railroad tracks there is and was
a wagon-way or road-way for pedestrians, vehicles, stock
and cattle, going from one side of said river to the other,
and for the use of which tolls are and have been (during
the times mentioned herein) charged by plaintiff, said
lower portion of said bridge being conducted and oper-
ated by plaintiff as a toll-bridge between the counties of
Colbert and Lauderdale. Said toll-bridge portion of
said bridge is built and erected upon the same piers or
foundation as said railroad portion of said bridge, the

tolls collected therefrom amounting to only $4,000 per annum. The bridge and defendant's track in connection therewith are used by the Louisville & Nashville Railroad Company and the Northern Alabama Railway Company for the passage of their trains—they paying a rental therefor.

"The plaintiff has been the owner and in possession of the said property of the said Memphis & Charleston Railroad Company, including the said bridge, from the date of confirmation of said sale up to the present time, using and operating the said bridge and railroad as hereinbefore stated. This bridge is on the right of way of the said line of the railroad from Tuscumbia to Florence and belongs to the plaintiff and the plaintiff is operating it in connection with its said line. Said bridge crosses the Tennessee river, which is the dividing line between Colbert and Lauderdale counties, Alabama. The toll house and toll keeper are located, and the tolls collected by plaintiff's agent, on the Lauderdale side or end of said bridge.

"The plaintiff is a railroad corporation engaged in interstate commerce, its line of railway extending through Alabama, Mississippi, Tennessee and other States. The said railroad part of said bridge is a part of the right of way of said railroad, and the plaintiff pays a license to the city of Florence as a railroad engaged in business there.

"Said bridge is within two miles of the corporate limits of Florence, Lauderdale county, Alabama, which, according to the last Federal census, is a town or city of more than 5,000 inhabitants; and is also within two miles of Sheffield, Colbert county, Alabama, which is a town or city of less than 5,000 inhabitants.

"On March 5, 1901, there was approved an act of the General Assembly of the State of Alabama, entitled 'An act to further amend the revenue laws of the State of Alabama,' being House Bill No. 1247, and said act is here now referred to and made a part hereof, being in Acts, 1900-1901, page 2610.

"On April 11, 1901, the plaintiff paid to the defendant as probate judge of Lauderdale county, Alabama, the

sum of one hundred, thirteen and 50-100 dollars, being the amount claimed by said defendant and by the tax commissioner of Lauderdale county, Alabama, to be due from said plaintiff under provisions of said act, and especially under sub-division 38 of section 17 thereof, by reason of its ownership and operation of said portion of said bridge as a toll bridge; said amount being $75 State license, $37.50 county license for Lauderdale county, and $1.00 fee, to the defendant as probate judge for the issuance of said licenses.    Said amount was paid by plaintiff under protest, it having been notified by C. P. Anderson, county tax commissioner for said county, that unless license for the operation of said toll bridge was promptly taken out and said amount paid therefor, he would be called upon to begin a prosecution for the collection thereof.    The plaintiff, through its attorney, stated to defendant at the time said money was paid to him, and the fact is, that said amount was paid under protest and to avert a criminal prosecution, and that the plaintiff claimed the same to be an unjust and illegal charge and demand, and that the said Southern Railway Company reserved the right to sue for the return or recovery of said sum so paid."

"At the time of said payment the defendant took a receipt for the money so paid, which recited the fact that the money was paid for the State and county licenses for operating said toll bridge, as provided by an act of the legislature, referred to, and that said amount was paid under protest.

"Said bridge is on a branch of railroad about four miles in length, extending from Tuscumbia, Alabama, to Florence, Alabama, in the counties of Lauderdale and Colbert, and connects with plaintiff's main line of road at Tuscumbia.

"The act of incorporation of said Florence Bridge Company, was approved January 12, 1832, and is in 'Acts of Alabama' of 1832, pp. 59-61.

"The General Assembly of Alabama, by a subsequent act, further regulated the charges allowed for tolls on said bridge, (see Acts of 1894-1895, p. 375) and subsequently by agreement between the Southern Railway

Company and the citzens of Florence, said act was amended. (See Acts of 1898-99, p. 774.)

"The charter of the Southern Railway Company, granted by the State of Virginia, does not contain any clause or provision authorizing it to acquire or operate toll bridges, unless such is contained in the following provision in said charter: 'With the approval of a majority of its stockholders, given at a meeting, it may, from time to time, lease, use, operate, consolidate with, or purchase, or otherwise acquire, or be leased, used, operated by, or consolidated with any railroad or transportation company now or hereafter incorporated by the laws of the United States, or of any of the States thereof, or any one or more of such railroad or transportation companies, or any other railroad or transportation company or companies which now are or hereafter may be leased, or used, or operated by, or consolidated with any one or more of such railroad or transportation companies; and, from time to time, it may consolidate its capital stock, property and franchises by change of name or otherwise, with the capital stock, property, and franchises of any other railroad or transportation company, power being hereby granted to any railroad or transportation company or companies incorporated by or under any act or acts of the General Assembly of the State of Virginia, with the approval of a majority in amount of its or their shareholders, respectively, given at a meeting, to make and carry out such contracts of consolidation or lease, sale or other method of acquisition; provided, that in all consolidations, a copy of the agreement therefor shall be filed in the office of the secretary of the Commonwealth of Virginia, and that any corporation with which said new corporation may consolidate, or which it may lease, shall be or remain subject to the jurisdiction of the courts of this State, and all lines of railroad operated by it in the State of Virginia shall be subject to the general laws of the State; and provided further, that any stockholder who dissents from any such consolidation may within sixty days thereafter apply by petition to the circuit court of the city of Richmond to determine the value of his stock, and shall

be entitled to receive from the new corporation the value as thus determined of such stock upon transfer thereof to the new corporation.

"All acts of the legislature of Alabama herein mentioned are adopted as part of this agreement, as if herein set out in full.

"The use of the present tense in this agreement with reference to the location, construction, condition and mode of use and operation of said bridge is intended to mean and includes also the location, construction, condition and mode of use and operation of said bridge at all times during the year 1901."

On the submission of the cause, the court rendered judgment in favor of the defendant, to the rendition of which judgment the plaintiff duly excepted. From this judgment the plaintiff appeals, and assigns the rendition thereof as error.

HUMES, SHEFFEY & SPEAKE, for appellant.—The plaintiff in this case was not liable for the privilege tax exacted of it for keeping a toll bridge. The revenue law under and by which such taxes are imposed, is unconstitutional, as being violative of section 19, Article IV of the Constitution of 1875, which provides "that no bill shall be so altered or amended on its passage through either house, as to change its original purpose." The title of the bill as passed and published in the acts is "to further amend the revenue laws of the State of Alabama." The bill as originally introduced was entitled "An act to provide for the more efficient assessment and collection of taxes and licenses in the State of Alabama." The original purpose of the bill as first introduced was to provide merely a mode or method of assessing and collecting taxes and licenses. Such original bill was not broad enough to authorize the creation of new subjects of taxes and licenses. It was, indeed, not a general revenue bill within the meaning of section 2, Article IV, or other constitutional provisions. Under its provisions the assessment of existing subjects of taxation or of license was authorized to be made in a different way,

or the collection of taxes or licenses from those then subject thereto was authorized to be made in different ways. It did not authorize an increase of the means charged in any license, or the creation of a new subject of license, such as a toll bridge. On the passage of the bill, the act which was finally passed, was introduced as a substitute, and an examination of the two bills, shows that the substitute wrought a change in the purpose of the original bill. This could not be done, and having been done, made the substitute, as passed, unconstitutional and void. "So long as its original purpose is not changed, the committee to whom it is referred, may refer it back with amendments, or may report a substitute," etc.—*State v. Buckley*, 54 Ala. 599. For history of H. B. No. 1247, see House Journal, pp. 966, 1013, 1016, 1440, 1460, 1548-49, 1806-7, 1877, 1880; Senate Journal, pp. 1082, 1148, 1186, 1192, 1236, 1306, 1354 and 1356.

The license tax is invalid and was not properly collected for the further reason that section 38 of the act imposing the tax upon toll bridges provides for a tax regulated by the vicinity of the bridge: If it is within two miles of a city of less than 5,000 inhabitants the tax is to be $50, and if within two miles of a city of more than 5,000 inhabitants, the tax is to be $75. The act makes no provision for a bridge which is on the county line between two counties and which is in within two miles of a city of both classes, as is this. It does not provide a method of assessment for such a bridge. There is no provision that where part of the bridge is in one county and part in another, either county has jurisdiction to impose a tax for the part therein. The act contemplates that the whole bridge be within the county seeking to impose the tax.

The agreed statement of facts shows, in effect, that this toll bridge is in fact only the lower portion of a railroad bridge, erected upon the same piers, having the same superstructure, that the toll feature is only incidental to the railroad feature; hence we contend that the two cannot be segregated for the purpose of taxation, and that the license for operating the railroad necessarily includes the right to operate another portion of the same bridge for toll purposes. The two cannot be separated

any more than a two-story house could be separated. Cooley on Taxation, 385; *State v. Hannibal & St. Jo. R. R. Co.,* 97 Mo. 348; s. c., 37 Am. & Eng. R. R. Cases, 406; *Railway Co. v. Keokuk Bridge Co.,* 131 U. S. 371, 389; *Plaff v. T. H. & I. R. R. Co.,* (Ind.) 29 Am. & Eng. R. R. Cases, 181; *P. D. & E. R. Co. v. Goar,* (Ill.) 29 Am. & Eng. R. R. Cases, 189; *St. Louis & S. F. R. Co. v. Williams,* 53 Ark. 58; s. c., 45 Am. & Eng. R. R. Cases, 20; *Anderson v. C. B. & Q. R. R. Co.,* 117 Ill. 26; s. c., 25 Am. & Eng. R. R. Cases, 522; *C. & A. R. Co. v. People, ex rel. Windmiller,* 153 Ill. 409; s. c. 29 L. R. A. 69; *Cook v. G., H. & S. A. R. Co.,* 5 Tex. Civ. App., 644; s. c. 24 S. W. Rep. 544; *Schmidt v. G., H. & S. A. R. Co.* 24 S. W. Rep. 547.

SIMPSON & JONES, *contra.*—As a matter of fact the original act contained a schedule of licenses and subjects of taxation, and this very matter of the license tax for operating a toll bridge is in the original act just as it appears in the substitute. An examination of the acts will show that the purpose of the original act was in no wise changed in the substitute. They are identical. The principal change was in the title. It is apparent that this change was made to make the act conform to the constitutional requirement that *each act shall contain but one subject.* If the court judicially knows the contents of the original act, it is apparent that its purpose is not changed by the substitute. And if the court did not know the contents of the original act, judicially, then the court would be bound to indulge the presumption that such was the case. "The unconstitutionality of an act enrolled, authenticated by the signatures of the presiding officers, and approved and signed by the Governor, must be affirmatively and clearly shown, before the courts are authorized to declare it void, because not having been passed in accordance with the rules of parliamentary law prescribed in the constitution."—*Hull v. Steele,* 82 Ala. 562.

In the case of *State ex rel v. Buckley,* it is held that a committee to whom a bill is referred may report it back

with amendments, or, if amendments are numerous, a substitute, if bill referred is not departed from in purpose, and such amendments or substitute do not remit it to the status of a new bill. Either house may adopt amendments or a substitute so long as the original purpose is adhered to.—*State ex rel v. Buckley,* 54 Ala. 599, 613. As said, the purpose of these bills is the same, and the title was amended so as to express the subject. The changes made by the special committee are ·such as are constantly made by legislative bodies, and such as are necessary to the orderly conduct of business.

It is claimed that the license cannot be collected because the bridge is on the line between the two counties, and because it is within two miles of a city of five thousand inhabitants and of a city of more than two and less than five thousand. That the State can graduate the tax on any basis it likes is clear.—Cooley on Taxation, Chap. 18, p. 385.

It is said this license interfers with interstate commerce. The toll bridge is wholly in Alabama, and the business on which the license is laid is done wholly in Alabama. The question is clearly settled in this State. *Moore v. The City of Eufaula,* 97 Ala. 670; *Etowah Min. Co. v. Christopher,* 112 Ala. 566.

And if the toll-bridge had been located in Alabama, or the toll keeper, and had landed parties in another State, the license laid would have been valid, and would not have interfered with interstate commerce or violated any provisions of the Federal Constitution.—*Wiggins Ferry Co. v. East St. Louis,* 107 U. S. Sup. Rep., p. 365; Reaffirmed in 145 U. S. Sup. Court Rep., p. 1.

It is suggested that appellant acquired the charter rights of the old Florence Bridge Company, and that that company had the right to operate the bridge without payment of license. The charter right is a contract that cannot be impaired by subsequent legislation. It would be a sufficient answer to say that the Southern Railroad has no right, under its charter, to acquire or hold the charter rights of the Florence Bridge Company, and the only show of right that the Southern Road has to operate this toll bridge is contained in the act of the Ala-

bama legislature, recently passed, regulating the tolls thereon.—*State of Maryland v. Consolidated Coal Co.*, 46 Md. 1.

McCLELLAN, C. J.—House bill 1247—legislative session 1900-1901—was a "General Revenue Bill" within the exception to the requirement of § 2, Art. 4 of the Constitution of 1875 (§ 45 Const. 1901) : "Each law shall contain but one subject, which shall be clearly expressed in its title;" the exception therefrom being "general appropriation bills, general revenue bills, and bills adopting a Code, digest, or revision of statutes." Being thus excepted, the title which it bore on introduction was no part of the bill. It was competent to embody in the bill any and all provisions for the raising of revenue or pertinent or germane thereto whether expressed in or covered by the title or not. The title could, therefore, be no index to the provisions of the bill, and being no part of it, the purpose of the bill must be found from the bill itself wholly apart from the caption under which it was written. Looking, as we therefore must, to the body of the bill, it is found, as we have stated, to be a general revenue bill, providing for the *levying*, assessing and collecting of all taxes intended thereafter to be raised for the use of the State, whether *ad valorem* taxes or taxes upon businesses or privileges, and whether by way of percentage on receipts or by way of licenses, and not at all confined to emendations of existing laws, with respect to the machinery so to speak, of the assessment and collection of taxes, as might appear to be its sole purpose if reference were had to its caption: "To provide for the more efficient assessment and collection of taxes and licenses in the State of Alabama."

At the time of the introduction of this bill there existed, of course, a general law of the State providing for the levying, assessing and collecting of all taxes, whether upon property, or upon subjects of taxation. The purpose of this bill being to cover that entire field of legislation, its effect would necessarily have been to change and modify such existing law in all particulars of in-

consistency between the two. The bill was, therefore, essentially amendatory of the existing law, and it is not inapt to say that its purpose was to amend the existing law. Indeed, had such bills not been excepted from the requirement as to each law containing but one subject and the clear expression of that subject in the title, this bill might well have been written under such a title as this: "To amend the revenue law of the State," or this: "To further amend the revenues laws of the State of Alabama." Either of these titles would have adequately expressed the purpose, the subject, of the bill.

We have then a bill introduced to raise revenue for the State, providing for the imposition—levying— assessment and collection of taxes, a general revenue bill, the necessary effect of which was to amend existing revenue laws of the State, which was intended to change such laws, and which might appositely have been entitled: "A Bill to be entitled an Act, To amend the revenue laws of the State." Upon its consideration by the house, it was found to be unsatisfactory to a majority of the members; and thereupon another bill was brought forward in its stead, and substituted for it by way of amendment of it. This substitute related to the same subject— the levy, the assessment and collection of taxes—the raising of revenue. It had the same general effect upon existing laws, i. e., the substitute operated the emendation of existing laws, as did the original. An essential effect of the substitute was to change such laws in many particulars, as had been the essential effect of the original, assuming its passage. This effect, of course, resulted from the body of the bills, their provisions. In the original this result is not expressed in terms, the purpose to this end is not expressly set forth, but it is nevertheless its purpose and effect. The substitute, on the other hand, not only expresses in its title the purpose "To further amend the revenue laws of the State of Alabama," but its provisions are in form amendatory of provisions in the existing laws. One reason for the substitute seems to have been to eliminate from the proposed act some of those provisions of existing statutes

which were embodied in the original bill without change. Another thing accomplished by the substitute was the elimination of some amendments proposed in the original; and doubtless there were changes proposed by the substitute which would not have resulted from the passage of the original. But for the rest and in the main the changes in the existing law proposed by the substitute and effected by its enactment, were the changes operated by the provisions of the original, or, rather, which would have resulted had the original been enacted, changes which it was the purpose of the original to make and which its enactment would have effected. Whatever may have been the similitude or the difference between the original bill and the substitute in their particular provisions, however, the *purpose* of the two, within the meaning of section 19 of Art. IV, Const. 1875, (§ 61, Const. 1901), was the same, viz.: to better provide for the raising of revenue, to change for its betterment the existing statutory system on that subject, and this, expressly or impliedly, by amending existing laws. Our conclusion, therefore, is that the original purpose of this bill was not changed on its passage through the house by the substitute for it which was enacted into the revenue statute, approved March 5, 1901, (Acts, 1900-1901, p. 2598): "To amend the revenue laws of the State of Alabama," and that, at least so far as any attack made on it in this case is concerned, it is a valid enactment.—*State, ex rel. Attorney-General v. Buckley,* 54 Ala. 599; *Hall v. Steele,* 82 Ala. 562; *Stein v. Leeper,* 78 Ala. 517.

Subdivision 38 of section 17 of that act provides a license tax on toll bridges as follows: "For each toll bridge, or bridges where thoroughfare tolls are charged for animals or vehicles crossing the same, when not within two miles of the corporate limits of a town or city of two thousand inhabitants, where the income is more than three hundred dollars and less than six hundred dollars per annum, five dollars; for same where income is over six hundred dollars per annum, ten dollars; for same, in or within two miles of the corporate

[Southern Railway Co. v. Mitchell.]

limits of any town or city of two thousand inhabitants
and less than five thousand, fifty dollars; for the same
in or within two miles of the corporate limits of a town
or city of five thousand inhabitants or more, seventy-
five dollars."

There is no difficulty in construing this act in respect
of and applying it to the facts of this case. The toll
bridge here involved spans the Tennessee river between
Lauderdale and Colbert counties within two miles of
Florence, a city of five thousand or more inhabitants,
situated in Lauderdale county, and also within two miles
of Sheffield, a city of between two and five thousand in-
habitants, situated in the county of Colbert. The li-
cense tax for the state is seventy-five dollars because
there *is* a city of five thousand or more inhabitants with-
in two miles of the bridge. To say that the tax would
be fifty dollars because there is a city of two or more
but less than five thousand inhabitants also within two
miles of the bridge at its other end, would be to say that
there must be *two* cities of five thousand or more inhab-
itants within two miles, respectively, of the bridge's
ends before the maximum could be imposed, and further
that if there is a city of five or more thousand inhabi-
tants at one end of the bridge or within two miles of it,
and no town or city of two thousand inhabitants at the
other end, not more than ten dollars could be imposed.
The statute contains no such conditions. The only con-
dition to liability for the maximum tax resting on pro-
pinquity to cities is that the bridge shall be in or within
two miles of the corporate limits of a town or city of
five thousand inhabitants or more, and when this con-
dition is filled, as it is here by the proximity of Flor-
ence, it is immaterial· what the population of Sheffield
is, or whether there had been any other town in the
neighborhood. Nor is it of any consequence that the
bridge is partly in each of the two counties. The State
·collects but one license tax and issues but one license;
and it is not concerned whether this tax is paid in Lau-
derdale or in Colbert county nor whether the license is
issued through the probate judge of the one or the other.
The amount of the tax is the same in either case, being

determined by the proximity of Florence though the license should be issued in Colbert county.

Nor is there any practical difficulty growing out of the imposition of the county tax. That is a percentage upon the State tax collected in the county. When the state license tax is collected in Lauderdale county, as it was in this case, it is the Lauderdale county tax that is superadded. If the state tax should be collected through the probate judge of Colbert county, the additional tax imposed by the commissioners of that county would be collected along with the state tax, and Lauderdale county would receive nothing. The county levy, in other words, is a mere appendage to the state levy, and when the state's levy may be paid in either of two counties, this appendage must be paid in the county where the state levy is paid.

The fact that a railway bridge is superimposed upon this toll bridge is unimportant. It is, nevertheless, in every feature a toll bridge within the terms and intent of the statute for the circumstance that the structure has a second deck or story which carries appellant's railway. This tax is not on the bridge as property and the analogy suggested by appellant's counsel to taxation of one story of a house and not others does not impress us. The other analogy suggested by appellee's counsel of the taxation of *the business carried on* in one story of a house though the business carried on in other parts of the house is not taxed, is quite apposite.

The insistence that this business of keeping a toll bridge cannot be taxed because such a bridge is a part of the structure which carries trains engaged in interstate commerce is equally without merit. Without considering the broader question as to the State's competency to levy taxes in respect of interstate commerce, it will suffice to say that the passage of vehicles and animals forth and back across the Tennessee river between Colbert county in this State and Lauderdale county, also in this State, cannot be contorted into any semblance to interstate commerce.

The further contention that because this toll bridge

[Milner & Kettig Co. v. DeLoach Mill Manufacturing Co.]

is on the right of way of the railway this tax cannot be imposed would be sound if it were the law that the business of retailing liquors in a house on the right of way of a railway could be carried on without let or license by the State authority; but that is not the law.

A corporation having no authority under its own charter to acquire and exercise the rights, powers and franchises of another corporation or to carry on the business of such other corporation, does not succeed to such rights, powers and franchises by purchasing the property of the other company, though it be the whole of such property employed by that company in carrying on the business it was chartered to engage in. Appellant is, therefore, not aided in this case by the fact that it purchased this bridge property from the Florence Bridge Company.

Affirmed.