# CHARLESTON.

T. E. HOOD *et als.* v. THE CITY OF WHEELING *et als.*

Submitted January 27, 1920.    Decided February 17, 1920.

1. STATUTES—*Bill Passed to Second Reading May be Then Amended in Usual Mode or by Adoption of Substitute Bill.*

    A bill regularly introduced and recommended by the proper committee to pass, read once and advanced to be read a second time on a subsequent day, may while at that stage of its progress be amended, either in the mode most frequently pursued, or by a substitute offered and adopted in lieu thereof, provided the substitute is not inconsistent with the main purpose and object of the original bill. (p. 582).

2. SAME—*Readings on Original Bill May be Included as Part of Required Readings of Substitute Bill.*

    A substitute bill, if germane to and not inconsistent with the main purpose and object of the original bill, need not itself

be read three times on three different days, pursuant to the requirement of section 29 of article 6 of the Constitution, but may include as part of its required readings those had before the substitution was made.   (p. 588).

3.  SAME—*Titles of Original and Substitute Bills Not Inconsistent Because Title of Latter Contains More Detail.*

The titles of a bill to amend the charter of a city and of a substitute therefor having in view the same general scope and object are not necessarily incongruous or inconsistent merely because the title of the latter contains a more detailed statement of the legislative history of the origin and subsequent amendments of the charter.   (p. 583).

4.  SAME—*Title of Amendatory Act Containing Provisions Germane to Object of Original Act Simply Referring to Section of Original Act Intended to be Amended is Sufficient.*

Where the title of an original act sufficiently expresses its object in the manner required by the Constitution, an act amendatory thereof or to be substituted therefor, if its provisions are germane to the purpose expressed in the title of the original and not inconsistent therewith, may, by its title, simply refer to the section of the original act which it is intended to amend, and this will be a sufficient compliance with section 30 of article 6 of the Constitution.   (p. 584).

5.  SAME—*Where Court Can Unmistakably Perceive Object of Bill it May so Construe it as to Effectuate Legislative Intent.*

Where the language of a bill enacted into law is ambiguous, obscure, doubtful and uncertain in its meaning, purpose and effect, a court ordinarily cannot supply words, phrases or clauses to remove the defects or supply the omissions to ascertain the legislative intent; yet where the act is in substance complete as it stands, and the court can readily and unmistakably perceive the object and pupose to be effected, this rule does not apply to forbid the interpretation or construction that will effectuate the legislative intendment.   (p. 585.)

6.  SAME—*Title of Bill to Amend City Charter Need not Show Intent to Annul Charter Rights of Towns Located in Territory to be Annexed.*

Where the title of a bill to amend the charter of a city, when read in connection with the section to be amended, discloses the object and purpose of the bill to be the annexation to the city of territory clearly defined by the bill, and within which are several towns incorporated pursuant to the provisions of chapter 47 of the Code, the title need not necessarily

disclose an intention or design to effect the annulment of the charter rights, powers and privileges of such incorporated towns; that being the inevitable result and ultimate consequence of the annexation.   (p. 589).

7.  Same—*Act Providing for Extension of City's Boundaries to Include Outlying Towns Repeals Charters of Such Towns and Does Not Amend Them.*

   An act amending the charter of a city by providing for an extension of its boundaries, the inevitable effect of which, if approved by the voters, is to bring within its limits incorporated towns lying within the territory annexed, is in effect a repeal of the charters of such outlying towns, not an amendment thereof, and therefore not in conflict with section 39 of article 6 of the Constitution.   (p. 589).

8.  Municipal Corporations—*Substantial Compliance With Act Directing Special Election on Question of Extending Boundary is Sufficient.*

   Where an act of the legislature directs that a special election be held to determine the question of the extension of municipal boundaries, and provides the general form of the resolution and notice to be given, a substantial compliance therewith is sufficient if it gives adequate notice of the time and places of voting and sufficiently designates the voters authorized to participate.   (p. 590).

Appeal from Circuit Court, Ohio County.

Bill for injunction by T. E. Hood and others, taxpayers, in behalf of themselves and others similarly situated, against the City of Wheeling and its Mayor and Members of the City Council.   From a decree dissolving an injunction plaintiffs appeal.

*Affirmed.*

*J. H. Brennan* and *John P. Arbenz,* for appellants.
*M. J. Cullinan* and *J. J. P. O'Brien,* for appellees.

Lynch, Judge:

The charter of the City of Wheeling, granted by the General Assembly of Virginia in the year 1836 and afterwards amended by that body and by the Legislature of this state from time to time, and finally at the regular 1919 session, provided in the amendment adopted that year for an extension of the territorial boundaries of the city, subject, however, to the approval of the electors duly qualified to vote and voting at the election thereby

authorized to be held and conducted within the time and in the manner required by such charter. If and when so approved, the areal boundaries of the city were to be, and as approved by the electors at the election so provided for, held and conducted for the purpose, were, enlarged so as to include territory other than and additional to that theretofore included within the city limits. The boundaries of the enlarged area the amendment definitely prescribed by geometrical courses and measurements, within the calls of which were Warwood, Fulton, Leatherwood, Woodsdale, Edgewood, Pleasant Valley, Elm Grove and Patterson, all of which were towns incorporated by the circuit court of Ohio County pursuant to the provisions of chapter 47 of the Code. Plaintiffs, who sue on behalf of themselves and others similarly situated, reside, are taxable and own taxable property within the newly incorporated boundary and within some of the towns therein included. Defendants are the City of Wheeling, its mayor and members of the city council.

In their original bill plaintiffs upon the facts alleged by them therein sought but failed to obtain from the circuit court of Ohio County, or the judges thereof sitting together in vacation, an injunction to prohibit defendants from holding and ascertaining the result of the election later held and conducted to determine the will of the voters respecting the incorporation of the proposed new territory within the corporate boundaries of the city. Afterwards plaintiffs amended their bill and therein alleged the same and other supplemental facts and circumstances disclosed by the changed conditions due to the election held in the interim and at which the voters assented to the enlargement of the corporate area of the city; and in addition to the relief asked in the first instance, so far as available in the second, again sought and failed to obtain a decree to enjoin defendants from making further preparation for perfecting the annexation, and assuming official management and control of the included territory and the incorporated towns therein located, and appropriating to the use of the city their treasuries and other property owned by them; and from admitting Charles H. Dowler and Arthur C. Stifel, elected to represent such new territory, to membership in the city council; and in general from doing or performing any other act or acts to cause to cease the right

and power of the officers and agents of these towns to exercise the duties conferred upon them by chapter 47; and from levying, collecting and appropriating to the use and benefit of the city taxes assessed against the persons and property of the taxpayers residing within the territory so annexed to the city; and from incurring and paying any indebtedness or liabilities in anywise related to the matters alleged in either bill, other than those already in good faith contracted and now due and payable by defendants, and all other acts of every kind and character done pursuant to the provisions of the amended charter. The injunction so prayed for and refused a member of this court subsequently awarded, and it the circuit court later dissolved; hence this appeal.

Of the two questions raised for the purpose of impeaching the validity or regularity of the passage of the bill amending the charter, one relates to its title, the other to the constitutional requirement for three successive readings thereof in the House of Delegates. Mr. Weiss of Ohio County, the patron of the bill, known in the journal of that body as House Bill No. 152, introduced it in the House, of which he was a member, wherein it was read by its title, referred to and amended by the Committee on Counties, Districts and Municipal Corporations, and by it reported to the House with the recommendation that it do pass, wherein it was read as so required and ordered to its second reading. While pending on the second reading the author moved, and the House concurred in the motion, to substitute in lieu of the bill then pending what plaintiffs argue is an entirely new bill, having a different title and dissimilar provisions, thereby rendering the latter so obnoxious to the purposes of the former as to constitute it a new and distinct bill, one which cannot avail itself of the reading theretofore had of House Bill No. 152, but which must itself conform to the constitutional requirement for three successive readings.

The title of House Bill No. 152 was: "A bill to amend and re-enact section 2 of chapter 21 of the acts of 1915 ('Greater Wheeling Charter'), and approved by a majority of the voters of the city of Wheeling at an election held" for the purpose. That of Substitute House Bill No. 152 was: "A bill to amend and re-enact section 2 of that part entitled 'Greater Wheeling

Charter' of an act of the legislature of West Virginia, passed
on the 20th day of February, 1915, entitled: 'An act to amend,
revise and consolidate into one act" acts amending and reen-
acting the city charter by the General Assembly of Virginia
and the Legislature of West Virginia, thereby disclosing the his-
tory of the different successive amendments since the year 1836,
and in such detail as forbids their restatement in an opinion, as
they occupy a full half page of the volume containing the mu-
nicipal charters enacted by the Legislature of 1919, where they
may be seen and read.

Section 2 of the Greater Wheeling Charter, referred to in both
bills, provided the procedure for enlarging the boundaries of
the city, which was to be done only by and with the consent of
a majority of the qualified voters of the territory proposed to be
annexed, and in the case of a municipal corporation requiring its
separate consent by majority vote. House Bill No. 152 con-
tinued and enlarged the general provision for the extension of
the boundaries of the city from time to time, by proper resolu-
tion of the council thereof and election held thereunder, and re-
tained in substance the provision of the original section pro-
viding against the annexation of territory of municipalities
without their separate consent by majority vote. The substi-
tute bill, however, repealed the original section 2 and provided
for a special election for extension of the city's boundaries
within certain defined limits; without continuing the general au-
thority theretofore existing to extend from time to time, and fur-
ther providing for the annexation of all the defined territory in
case a majority of all the votes cast, both in Wheeling and in the
territory proposed to be annexed, should be in favor of annex-
ation.

There is, it is true, as counsel say, some disparity between the
titles. They are not the same, but are they so utterly dissimilar
and variant as to warrant a declaration of the invalidity of the
title of the substitute? A careful examination and compari-
son of the titles does not disclose or reveal such inconsistency be-
tween them as subjects the latter to condemnation on that ac-
count. Both indicate a purpose to make changes in the provis-
ions of section 2 of the Greater Wheeling Charter of 1915, an
inspection of which shows that it relates to the manner and pro-

cedure for extending the city's boundaries from time to time. So far at least there appears nothing warranting the criticism urged against the title of the substitute. They purport to amend the same section of an earlier act. Their purposes and objects are consistent and relevant. There is no substantial variance between the designs manifested in the titles.

Plaintiffs further object to the sufficiency of the title of the substitute because of its failure to show, as one of the objects of the proposed amendment of section 2, the annulment of the charters and powers conferred upon the incorporated towns lying within the superadded territory and their incorporation into the City of Wheeling. But the title of the substitute did give full and ample notice, at least such notice as is usually deemed sufficient, to warn plaintiffs and others similarly situated and on whose behalf they sue of an intention to alter the provisions of section 2 of the charter known to relate to the extension of boundaries, and an investigation of the bill based upon such warning would have disclosed an intention to annex to Wheeling the territory therein specifically identified. The title of the act involved in *Roby* v. *Sheppard*, 42 W. Va. 286, (Chapter 63, Acts 1895) amending and re-enacting the charter of the City of Benwood, was no more specific than the title here in question, yet it was sustained as sufficiently broad to warrant taking from another town part of its territory and population and annexing it to the city of Benwood. See also *Attorney General* v. *Amos*, 60 Mich. 372. Plaintiffs and those in behalf of whom they complain thus had the source of information and knowledge sufficient to show a purpose to effect, with the approval of the voters, the total annulment of the rights of the officers and agents of these towns to exercise the powers conferred upon them by virtue of their incorporation. They knew such must be the immediate and inevitable consequence and effect of the extension of the corporate boundaries of Greater Wheeling, if and when the voters approved it. The title of an act need not reveal the legitimate and inevitable consequences of the duly authorized enlargement of the boundaries of cities, towns and villages. As said in *Heath* v. *Johnson*, 36 W. Va. 782: "When the title of an original act of the legislature sufficiently expresses its object in the manner required by the Constitution, an act amendatory

thereof may, by its title, simply refer to the section of the original act which it is intended to amend, and this will be a sufficient compliance with section. 30 of article 6 of the Constitution." See also *Roby* v. *Sheppard, supra; Carnegie Natural Gas Co.* v. *Swiger,* 72 W. Va. 557, 563; 25 R. C. L. 869. The titles of the original acts referred to in the title of the substitute bill sufficiently state the general scope of their subject matter. The constitutional provision does not require that the details of the legislation be disclosed; otherwise it would be necessary for the title of an act, of itself, to contain the entire act. 25 R. C. L. 855.

Nor is there merit in the contention that the title fails to state the purpose of the bill to repeal section 2 and in lieu thereof to enact another to be known by the same designation. The statement of a purpose to amend and re-enact is sufficient to include the former, for there is no substantial difference in result whichever course is followed. The operative effect of the old law ceases, if amended and re-enacted in toto, with the same promptness and result as if it is repealed and a substitute enacted.

Then again counsel criticize the omission of part of a verb from the enacting clause of the bill which provides that section 2 "be and the same is hereby repealed and a new section be and is hereby in lieu thereof, to be known as section two, as follows." This leads to the inquiry whether the omission of some word in the clause, charged by plaintiffs to be fatal, is indeed fatal. We do not so consider it. The insertion of the word "enacted" between "hereby" and "in", so as to make the clause read, "and a new section be and is hereby enacted in lieu thereof," or the insertion of some other word having an equivalent meaning, would render the clause clear and unequivocal. But even without such word, when the words "be and is" receive due emphasis in connection with the phrase "to be known as", the language is sufficiently clear for all necessary purposes.

The irregularity relied on and urged in argument as a ground for the award of the injunction prayed for by plaintiffs is, as we have seen, the failure to read in the House three times, in as many succeeding days, the bill introduced and adopted in lieu

of the first while it was pending on the second reading. The new or "Substitute House Bill No. 152" supplanted and superceded the original. Thereafter and until enacted into law it was called and known by that name and number. It was read in lieu of the bill so supplanted and advanced to the third reading. The defect in this procedure, if any there was, may be said to have inhered in the measure through all subsequent stages of its legislative history. But was there such departure from the regular parliamentary practice as defeated the purpose of its enactment? Was it necessary to treat it as at the proper stage for the first reading, and to read and advance it for the second and third readings, pursuant to the rule ordinarily prevailing as to the regular passage of bills?

By the action of the House the substitute took the place and position occupied by the bill it supplanted. It thereby became the only bill and operated as an amendment of the former. The mere absence of the words, "substitute in the nature of an amendment," does not have the significance imputed to it by plaintiffs. Every substitute is of such nature if germane to the original bill. A bill amended in whatever form is advanced to a higher, not relegated to a lower or subordinate status, except by the adoption of a motion to that effect. As disclosed by the journal, said bill, "on second reading, coming up in regular order for consideration, Mr. Weiss moved the following 'Substitute House Bill No. 152' be substituted for and in lieu of House Bill No. 152," and after unsuccessful motions to recommit and to lay over, "the question recurring upon the motion of Mr. Weiss to substitute for and in lieu of House Bill No. 152 'Substitute House Bill No. 152,' the same was put by the chair and prevailed. The Bill (Substitute House Bill) was then read a second time and ordered to its engrossment and third reading." The action of the House seems to conform with the rule prescribed by the authorities, and to settle beyond doubt the question relating to the regularity of the passage of the bill amending the city charter.

As somewhat but not entirely analogous in its facts *Smith* v. *Mitchell*, 69 W. Va. 481, Ann Cas. 1913 B, 588, furnishes ample illustrations of the propriety of the application of the rule regarding the substitution of one bill for another, when

relevant to the same general subject.  As disclosed in the opinion, the Senate and House had under consideration at the same time two bills, identical in title and content, which had for their purpose the amendment of the charter of the City of Point Pleasant.  The House bill was passed first and reported to the Senate.  The Senate bill was read twice on different days, and on second reading the Senate substituted the House bill for it, and under that name the bill was read on another day and passed by the Senate.  This, it was argued in that case, violated and disregarded the express constitutional requirement for three full and distinct readings of a bill in each house on three different days before it could become a law.  Section 29, Art. 6, Const.  After commenting upon the theory and wholesomeness of this rule and its obvious purpose to prevent hasty and illy considered legislation, it is remarked in the opinion: "The two readings of the Senate bill and the third reading of the substituted House bill did this just as effectually as if the House bill had not been substituted for the Senate bill, and the Senate bill had been retained and read a third time and passed.  *  *  * We can hardly call it a substitute because it is identical in matter with Senate Bill 99.  But suppose even that the bills were not so identical; still the substitute bill, if so germane to the original bill as to be a proper substitute, would not have to go back and be read three times.  A substitute is an amendment."

And the court quotes the following with approval from *Miller and Gibson v. State,* 3 Oh. St. 475:  "But for argument's sake, let it be admitted that the bill as amended was read but once in the Senate; is the act for that reason void?  That, counting two readings before the amendment and the final reading, the bill was read three times, is conceded, for these readings are shown by the journal, and it is conceded that, in general, three readings of an amendment are not necessary.  But inasmuch as the amendment in this case is styled in the journal a 'New Bill,' it is said that three readings were necessary.  Why necessary?  The amendment was not the less an amendment because of the name given it.  It is not unusual in parliamentary proceedings to amend a bill by striking out all after the enacting clause and inserting a 'New Bill.'  When the subject or propo-

sition of the bill is thereby wholly changed, it would seem to be proper to read the amended bill three times, and on different dates; but where there is no such vital alteration, three readings are not required."

The inaptness of the decision in *Smith* v. *Mitchell* is apparent, according to the able argument of counsel for appellees, because of the difference between the facts of the two cases. There the substituted bill was identical in title and content with the Senate bill whose place it took; here it was not so identical. Appellants admit, as we understand, that had not the substitute carried a different title, and had its author caused its contents to be inserted under the title and enacting clause of the original bill, the proceedings in this respect at least would have been less irregular. This the House did not do, but accepted the substitute and its own title and enacting clause. Just what difference, if any, this makes is not clear, because the usual course pursued in respect to the title of a bill is to defer alterations or changes in it to conform with the objects and purposes of the bill until it has reached the final stage of its passage; and such deferment in effect occurred. For as appears on pages 556 of the House journal and 657 of the Senate journal, the substitute "was read a third time and passed with its title." By these acts the title was approved, thereby validating whatever may be said regarding its original status.

From what has been said the conclusion readily comes that a substitute bill or amendment, if so germane to the original bill as to be a proper substitute or amendment, does not have to go back and be read three times, but may include as part of its required readings those had before the substitution or amendment was made. *Capito* v. *Topping,* 65 W. Va. 587, pt. 9, Syl; *Smith* v. *Mitchell, supra,* 69 W. Va. 481; *Brown* v. *Road Commissioners,* 173 N. C. 598; *Southern Ry. Co.* v. *Memphis,* 126 Tenn. 267; *Attorney General* v. *Amos,* 60 Mich. 372; *Southern Ry. Co.* v. *Mitchell,* 139 Ala. 629. Was there such disparity or lack of harmony as constitutes grounds for the charge that the provisions of the substituted bill were not germane and relevant to those of the original or displaced bill, and therefore not a proper amendment of the latter? Their provisions are not the same, but sameness is not essential. Provisions wholly

discordant from the text may be, and not infrequently are, inserted by way of amendment, provided the main purpose and essential character of the original are not necessarily impaired or modified. The charge here is that while the bill first introduced conferred upon the Wheeling council the right virtually to amend the charter by enlarging the city boundaries, but only with the separate consent by majority vote of the territory or municipalities to be annexed, the substitute provided for a special election for extension of boundaries within specified limits, without continuing the general authority accorded in the original bill to extend them from time to time, and further provided that a majority of the votes cast, not only in the territory to be annexed but also in the City of Wheeling, should determine the result of the election. But such changes either the House or the Senate could, and perhaps would, have made by an amendment offered and adopted when the bill had reached the stage proper for that purpose. If the ordinary motion to amend would avail, so may a substitute. Both attain the same end and accomplish the same object—the perfection of bills to suit the intention of their sponsors and the demands of the persons to be affected. The changes were germane and relevant and do not render the bills so dissimilar as to necessitate additional readings of the substitute.

Another ground urged to show plaintiff's right to a reversal of the decree complained of is the nullification of the charters of the towns located within the territory so incorporated into the City of Wheeling, in violation of section 39, Art. 6 of the Constitution, which prohibits the legislature from amending by special act the charter of any city, town or village containing a population of less than two thousand inhabitants. But nothing in our Constitution prohibits "the legislature from passing a special law repealing the charter of a municipal corporation, or uniting the territory of several municipal corporations, and thus repealing their former charters." *South Morgantown* v. *Morgantown,* 49 W. Va. 729. In the case cited an act of the legislature (chapter 144 Acts 1901) creating a new corporation to include all the territory theretofore covered by four towns was sustained. Many of the issues raised and elaborately discussed by counsel representing both parties to that contro-

versy seem so clearly pertinent and significant as to justify delay in noting the principles declared by the opinion to have substantial merit. According to that opinion, a mere grant of a charter to a municipal corporation does not create an indissoluble contractual relation between the state and the municipality, but rather a temporary instrument ordained to assist the state in the administration of governmental functions within a certain prescribed area, and vests in the corporation no right which a subsequent legislature may not annul. "The power of the legislature to divide large municipalities, to annul their old charters, to reorganize them, to consolidate small ones, as well as to detach portions of territory from one and annex them to another, to meet the wishes of its residents, or to promote the public interest, as understood by the legislature, is conceded to the legislature * *. * in the absence of constitutional prohibition." And section 39, Art. 6, Const., though limiting the amendment of charters, "does not stay the hands of the legislature in the repeal of a charter." This detachment and annexation of territory occurred in *Roby* v. *Sheppard,* 42 W. Va. 286, a case which involved the right and power of the legislature to incorporate into Benwood part of McMechen, also an incorporated town having a population of less than two thousand. Neither the title of the act amending the Benwood charter, nor the act itself, afforded any notice of an intention to give to Benwood any part of the territory of McMechen, except such notice or source of information respecting the diminution of the area of the one and the enlargement of the area of the other as the altered boundary lines themselves disclosed; and the court said, point 1 of the syllabus: "A statute amending the charter of a town containing upwards of two thousand population, which takes from another town of less population than two thousand some of its territory, is not a special act amending the charter of a town of less population than two thousand prohibited by section 39, Art. 6 of the Constitution." For these reasons we think there is no merit in plaintiff's argument upon this point.

A further question is likewise urged upon our attention by plaintiffs, namely, that of the sufficiency of the resolution providing for, calling and giving notice of the election upon the

question of annexation, as provided for in the amending act, in order to afford the voters to be affected thereby an opportunity to express their approval or disapproval of the proposed extension of the city boundaries. The resolution, the sufficiency of which as regards electors residing within the former limits of the city is denied, recites in the form of a preamble the passage of the amending act and the requirement of the submission to the duly qualified electors "of all the territory to be included in said boundaries" the question of the extension thereof; and as further showing what voters are intended, "all of which is within Ohio County, West Virginia, in addition to the lands, grounds, waters, water courses and territory included within the City of Wheeling as at present bounded." This resolution, as we read and consider it, furnishes ample notice and warning of an intention to hold an election within the City of Wheeling as formerly bounded, as well as within the territory proposed to be annexed, and invites all persons qualified to exercise the franchise right therein to vote upon the question so submitted to them. The purpose could have been made more explicit, it is true; nevertheless it is difficult to perceive how a reasonably intelligent voter could have mistaken the real and ostensible purpose of the election or the persons who were called upon to express by their ballots their views upon the question so submitted for decision. There is nothing in the record to show misconception of the purpose or the voters intended.

Of course, if notice is not given substantially as and when required by law, and it appears that by reason of the omission a fair opportunity was not afforded the electors to vote, the election cannot stand where the result might otherwise have been different. *Hill* v. *Skinner,* 169 N. C. 405. But here notice was given substantially as required by the statute. Though of the total voters, shown by a previous registration to be 11,634, less than a majority voted in favor of the proposition, it does not appear that any qualified voter failed or refused to vote because of the inadequacy of the notice. The total vote cast seems to have been as large, if not larger, than is customary at special elections, and there further appears the extreme inclemency of the weather on election day due to an incessant downpour

of rain during the hours fixed by law for holding general and special elections. It is not denied that residents of the territory to be annexed had ample notice.

In 9 R. C. L. 992 this statement occurs: "Frequently irregularities (in the giving of notice) occur in following statutory requirements and the validity of the election is brought into question." After a discussion of the rule applicable to general elections the author continues: "It is equally clear in the case of special elections, wherein the necessity for notice is so much more urgent, that the rule as to compliance with statutory requirements in the giving of notice should be much more strictly enforced. Considerable liberality, however, is allowed even in these elections, and it is a rule of pronounced authority that the particular form and manner pointed out by a statute for giving notice is not essential, provided, however, there has been a substantial compliance with statutory provisions." In line with this policy also are: *Hill* v. *Skinner,* cited; *State* v. *Salt Lake City,* 35 Utah 25; *Seymour* v. *Tacoma.* 6 Wash. 427; *State* v. *Doherty,* 16 Wash. 382; *Wheat* v. *Smith,* 50 Ark. 266; *Staple* v. *Astoria,* 81 Or. 99; *Patton* v. *Watkins,* 131 Ala. 387, note, 90 A. S. R. 43, 71; *State* v. *Town of Westport,* 116 Mo. 582; *Com.* v. *Smith,* 132 Mass. 289; *Adsit* v. *Osmun,* 84 Mich. 420; 10 Am. & Eng. Enc. Law, 626, 631. See also *Grffith* v. *County Court,* 80 W. Va. 410.

The crucial point, the one urged with most emphasis by appellants in argument, is the alleged incompetency of the notice purporting to advise the electors resident within the City of Wheeling of the impending election to ascertain their will upon the question about to be submitted to them for decision. The charter as amended did not definitely prescribe the date of the election, but required that it be held "not before October 1, 1919, and not later than December 1, 1919," and authorized the city council to specify the exact date therefor. This they did by resolution appointing November 26, 1919, for that purpose. The act itself amply warned the electors, not only in the territory to be annexed, but also in the City of Wheeling, of a prospective demand for an expression of opinion upon a subject in which their interests were about to be affected as residents and property owners, and to be aware of the time

and place later to be appointed for them to express their decision upon the merits of the proposition submitted to them. Unto them the charter was law and bound them to take due notice of its requirements. The first part of the published notice, read by itself, is ambiguous and seems to call only upon the voters in the territory to be annexed for an expression of approval or disapproval. But when read in its entirety and as a related whole, and especially with the specific provision that "the voting places and precincts for such election shall be as follows," accompanied by an enumeration of voting places within each ward of the City of Wheeling, as well as those in the outlying territory, the notice is sufficiently definite to show that all voters in the entire community, those already incorporated into the city and those proposed to be united with it, were called upon to vote. The notice was amply sufficient to advise all persons of reasonable intelligence to attend at the time and places so designated, and to pass judgment upon the propriety of the proposed annexation, and could not reasonably mislead anyone. Furthermore we think there is no substantial warrant for the objection urged respecting the filing of certain affidavits.

For the reasons stated we affirm the decree without further discussion.

*Affirmed.*