**Electronically Filed
Supreme Court
SCAP-19-0000372
04-NOV-2021
07:53 AM
Dkt. 55 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

LEAGUE OF WOMEN VOTERS OF HONOLULU and COMMON CAUSE,
Plaintiffs-Appellants,

vs.

STATE OF HAWAIʻI,
Defendant-Appellee.

SCAP-19-0000372

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-19-0000372; CASE NO. 1CC18-1-001376)

NOVEMBER 4, 2021

NAKAYAMA, McKENNA, AND WILSON JJ.,
AND RECKTENWALD, C.J., DISSENTING, WITH WHOM
CIRCUIT JUDGE KAWAMURA, IN PLACE OF POLLACK, J.[1], RECUSED, JOINS

OPINION OF THE COURT BY NAKAYAMA, J.

## I. INTRODUCTION

Plaintiffs-Appellants League of Women Voters of

Honolulu and Common Cause (collectively, "Plaintiffs") appeal

_____

[1]   Associate Justice Richard W. Pollack retired on June 30, 2020.

from the Circuit Court of the First Circuit's (circuit court) final judgment, which granted Defendant-Appellee the State of Hawaiʻi's (the State) motion for summary judgment.

In the underlying proceeding, Plaintiffs filed a complaint in the circuit court seeking a declaratory order that a recently enacted bill was adopted through an unconstitutional process and therefore is void as unconstitutional. Plaintiffs challenged the adoption of a law requiring hurricane shelter space in new public schools on the grounds that it violated article III, section 15 of the Hawaiʻi Constitution because the bill did not receive three readings in each house of the Hawaiʻi State Legislature (the Legislature) before it was passed and signed into law. The bill that was signed into law was first introduced in the Senate as "A Bill for an Act Relating to Public Safety" and required annual reporting of recidivism statistics by the State. The House of Representatives ("the House") amended the bill to require hurricane shelter space in new State buildings and deleted all reference to recidivism reporting. The hurricane shelter version of the bill received one reading in the Senate before it passed and eventually became law.

The State filed a motion for summary judgment, arguing that the Legislature's own rules of procedure permit a bill to

be read only by number and title and do not require the three readings to start again after a bill is amended, even if the bill's contents are entirely deleted and a substituted bill is introduced.  Plaintiffs also filed a motion for summary judgment.  The circuit court granted the State's motion for summary judgment and denied Plaintiffs' cross-motion, holding that the process for enacting the law complied with the Legislature's adopted rules of procedure, which do not require the three readings to start again in each legislative chamber after a bill is amended or replaced.

On appeal, Plaintiffs again argue that the process for adopting the bill violated section 15 because, after the House made non-germane amendments to the recidivism reporting bill, the Senate did not hold the required three readings to consider the hurricane shelter bill.  We agree.  The plain language of section 15 states that "No bill shall become law unless it shall pass three readings in each house on separate days."  Haw. Const. art. III, § 15.  Here, the bill received three readings in each house by title and number, but the substance of the bill changed when the House introduced the hurricane shelter substitution, which was unrelated to the original recidivism reporting bill.

We conclude that article III, section 15 of the Hawaiʻi

Constitution requires that the three readings begin anew after a non-germane amendment changes the purpose of a bill so that it is no longer related to the original bill as introduced.

For the reasons stated herein, we determine that Senate Bill 2858, Senate Draft 2, House Draft 1, Conference Draft 1, 2018 Haw. Sess. L. Act 84 at 432 ("Act 84" or "S.B. 2858") violated this requirement. Accordingly, we vacate the circuit court's orders and judgment granting the State's motion for summary judgment and denying Plaintiffs' motion for summary judgment and remand to the circuit court with instructions to grant Plaintiffs' motion for summary judgment.

## II.  BACKGROUND

### A.  Act 84

Senate Bill No. 2858, "A Bill for an Act Relating to Public Safety," was introduced in the Senate on January 24, 2018.  As originally introduced, S.B. 2858 would have added new sections to Hawaiʻi Revised Statutes (HRS) Chapter 353, to require the State Department of Public Safety (DPS) to prepare and submit an annual report to the Legislature that tracked the rehabilitation and re-entry performance indicators for individuals released from prison ("recidivism reporting bill"). With minor amendments, the recidivism reporting bill passed three readings in the Senate.

4

On March 8, 2018, after crossover[2] from the Senate, the recidivism reporting bill passed its first reading in the House.

On March 15, 2018, the House Committee on Public Safety held a hearing on the recidivism reporting bill and received testimony from interested parties, including the DPS, the Office of Hawaiian Affairs, the Hoʻomanapono Political Action Committee, the Hawaiʻi Justice Coalition, the Community Alliance on Prisons, Young Progressives Demanding Action, the ACLU of Hawaiʻi, and private citizens.

Despite the fact that the interested parties largely supported the recidivism bill, the House Committee on Public Safety recommended amending S.B. 2858 "by deleting its contents and inserting the substantive provisions of House Bill No. 2452, H.D. 1," ("H.B. 2452") which would require that State buildings constructed after July 1, 2018 include hurricane shelter space ("hurricane shelter bill").[3]  H.R. Stand. Comm. Rep. No. 1255-18,

---

[2]    "Crossover" occurs when a bill is voted on three times in the originating legislative chamber and crosses over to the other chamber for consideration.  Legislative Reference Bureau, A Bill's Journey, https://lrb.hawaii.gov/par/overview-of-the-legislative-process/a-bills-journey.

[3]    The House Committee on Public Safety offered no explanation as to why it recommended gutting the contents of the recidivism reporting bill and replacing it with the hurricane shelter bill and merely stated:  "Your Committee has amended this measure by deleting its contents and inserting the substantive provisions of House Bill No. 2452, H.D. 1, which was heard by your Committee earlier this session."  H.R. Stand. Comm. Rep. No. 1255-18, at 2.

at 2 (2018).  On March 21, 2018, the House amended S.B. 2858 according to the committee's recommendation and S.B. 2858 — as the hurricane shelter bill — passed its second reading in the House.

On March 28, 2018, the House Committee on Finance held a hearing on the hurricane shelter bill and accepted public testimony.  The Office of Hawaiian Affairs and Young Progressives Demanding Action offered testimony asking legislators to revert the bill to its original subject as the recidivism reporting bill.[4]  While the House Committee on Finance noted the objections of interested parties to the substituted bill, it nevertheless recommended passing the hurricane shelter bill unamended.  On April 6, 2018, S.B. 2858 passed its third reading in the House.

On April 10, 2018, S.B. 2858 was transmitted to the Senate.  The Senate disagreed with the House amendments and a conference committee of House and Senate members met to confer.

---

[4]     The Office of Hawaiian Affairs commented, inter alia, that hurricane preparedness is a "laudable goal," but that the hurricane shelter draft of S.B. 2858 "would abandon the critically important purpose of previous drafts to require the Department of Public Safety [DPS] to collect, aggregate, and publicly report data relating to key enumerated performance indicators[,]" which was critical to reforming the criminal justice system.

Young Progressives Demanding Action offered similar comments, stating that the group does "not oppose the construction of hurricane shelters," but was "nevertheless disappointed that the House Public Safety committee decided to gut an important bill that would have required the [DPS] to report on program outcomes."

The conference committee recommended that S.B. 2858 be amended to delete the hurricane shelter space requirement and instead provide that the State must consider hurricane resistant criteria when designing and constructing new public schools. The Senate adopted the conference committee's recommendation and S.B. 2858 passed final reading in both chambers on May 1, 2018. S.B. 2858 was signed by the Governor as Act 84 and became law on June 29, 2018.

B.    **Proceedings in the Circuit Court**

On September 5, 2018, Plaintiffs filed a complaint in the circuit court challenging the enactment of Act 84 as unconstitutional. The complaint alleged that: (1) the title of S.B. 2858 "Relating to Public Safety" does not satisfy the subject-in-title requirement of article III, section 14 of the Hawai'i Constitution ("section 14")[5]; and (2) "the hurricane shelter version of S.B. 2858" did not "have the required three readings in the Senate[,]" in violation of article III, section 15 of the Hawai'i Constitution ("section 15").[6] Plaintiffs sought a declaratory order that Act 84 was adopted through an

---

[5]    Section 14 provides in relevant part that "[e]ach law shall embrace but one subject, which shall be expressed in its title." Haw. Const. art. III, § 14.

[6]    Section 15 provides in relevant part that "[n]o bill shall become law unless it shall pass three readings in each house on separate days." Haw. Const. art. III, § 15.

7

unconstitutional process and therefore is void as unconstitutional.

On October 9, 2018, the State filed a motion for summary judgment, arguing that Act 84 is constitutional and that Plaintiffs' claims presented a nonjusticiable political question.

On October 25, 2018, Plaintiffs filed a cross-motion for summary judgment. The Legislature subsequently moved for and was granted leave to appear as amicus curiae in support of the State's motion for summary judgment.

On January 24, 2019, the circuit court heard the cross-motions. The circuit court orally granted the State's motion for summary judgment and denied Plaintiffs' cross-motion, holding that the process for adopting Act 84 complied with the circuit court's interpretation of the three readings and subject-in-title requirements of the Hawai'i Constitution. The circuit court stated that its interpretation of the three readings requirement hinged on the Legislature's own rule of procedure:

> [W]hat sways the Court on [the issue of three readings] is the fact that the Legislature adopted rules of procedure and, in the course of doing that, adopted as part of its procedures the Mason's Manual. And it is that Mason's Manual provision, Section 722, and I also did rely on Section 617 that talks about the nature of the substituted bill to arrive at the conclusion that the procedure of the Legislature is such that if a replace and substituted bill is adopted, then under Section 722, the Legislature is not

> required to conduct three more readings because they have already had in each house the three readings.
> And that suffices to meet the constitutional mandate of three readings in each house one day apart so the Court is not able to find that there was any violation of the Constitution with respect to the three readings.

(Emphasis added.)

On April 3, 2019, the circuit court entered written orders granting summary judgment in favor of the State and denying Plaintiffs' cross-motion. As pertinent here, the circuit court made the following conclusions of law:

> 1. There was no violation of the Hawaiʻi Constitution with respect to the three readings. Based on sections 617 and 722 of Mason's Manual of Legislative Procedure (2010 rev. ed.), the procedure of the legislature is such that if a replaced and substituted bill is adopted, then the legislature is not required to conduct three more readings because they have already had the three readings in each House and that suffices to meet the requirements of the constitutional mandate.
>
> ....
>
> 3. The court has no issue regarding Plaintiffs' standing. They are organizations that are dedicated to ensure integrity in the legislative process, and that is what this case is about.
>
> 4. Defendant State of Hawaii's separation of powers argument is rejected. The court has the power to adjudicate the constitutional validity of statutory enactments.

Thus, the circuit court concluded that Act 84 was constitutional and that the State was entitled to judgment as a matter of law and entered final judgment in favor of the State.

**C.   ICA Proceedings and Subsequent Transfer**

On May 2, 2019, Plaintiffs timely appealed the circuit court's decision to the ICA. In their opening brief, Plaintiffs

9

raised two points of error:

> 1. Whether the three readings requirement — article III, section 15 — of the Hawaiʻi Constitution requires that each chamber of the Legislature hold three new readings of proposed legislation after the Legislature removes a bill's content and replaces it with a proposal that is not germane to the intent of the original bill.
>
> . . . .
>
> 2. Whether legislation broadly titled as "relating to public safety" reasonably apprises the public of the interests that are or may be affected by the statute and otherwise complies with the subject in title requirement — article III, section 14 — of the Hawaiʻi Constitution.

After the State filed its answering brief, Plaintiffs filed an application for transfer, which this court granted on December 18, 2019.

The Legislature submitted an amicus brief echoing the State's arguments. The Tax Foundation of Hawaiʻi and the Grassroot Institute of Hawaiʻi filed amicus briefs in support of Plaintiffs.

## II. STANDARDS OF REVIEW

### A. Summary Judgment

"An order granting summary judgment is reviewed de novo, using the same standard as that applied by the circuit court: whether there were any genuine issues of material fact and whether the movant was entitled to judgment as a matter of law." Blair v. Harris, 98 Hawaiʻi 176, 178, 45 P.3d 798, 800 (2002).

## B.    Constitutional Interpretation

"Issues of constitutional interpretation present questions of law that are reviewed de novo."  [Blair, 98 Hawai'i at 178, 45 P.3d at 800] (citation omitted).  In construing the constitution, this court observes the following basic principles:

Because constitutions derive their power and authority from the people who draft and adopt them, we have long recognized that the Hawai'i Constitution must be construed with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpreting a constitutional provision is to give effect to that intent.  This intent is to be found in the instrument itself.

[T]he general rule is that, if the words used in a constitutional provision are clear and unambiguous, they are to be construed as they are written.  In this regard, the settled rule is that in the construction of a constitutional provision the words are presumed to be used in their natural sense unless the context furnishes some ground to control, qualify, or enlarge them.

Moreover, a constitutional provision must be construed in connection with other provisions of the instrument, and also in the light of the circumstances under which it was adopted and the history which preceded it.

Hanabusa v. Lingle, 105 Hawai'i 28, 31-32, 93 P.3d 670, 673-74 (2004) (brackets in original) (quoting [Blair, 98 Hawai'i at 178-79, 45 P.3d at 800-01]).

Sierra Club v. Dep't of Transp., 120 Hawai'i 181, 196, 202 P.3d 1226, 1241 (2009).

### III.  DISCUSSION

Plaintiffs ask this court to decide whether section 15 requires the three readings to begin anew after a non-germane amendment fundamentally changes the purpose of a bill. Plaintiffs argue that the three readings requirement must be

interpreted in light of its purpose, which is to provide opportunity for a full and informed debate, prevent hasty and ill-considered legislation, and provide notice of proposed legislation to allow for meaningful participation by the public in the legislative process.

The State and Legislature argue that the plain language of section 15 does not require the three readings to begin anew after an amendment and that this court should not read in an intent where there is none. The State maintains that the Legislature's adopted rules of procedure permit a bill to be read by its identifying title only, eliminating the need for readings to begin anew when a bill is amended.

We conclude that Act 84 is invalid because it was not enacted in conformance with the requirements set forth in the Hawai'i Constitution. Namely, Act 84 did not receive three readings in each house of the Legislature after its contents were entirely gutted and replaced with the hurricane shelter bill.[7]

**A.   Plaintiffs have standing to challenge Act 84**

The State contends that Plaintiffs lack standing

---

[7]   Because it is clear that Act 84's enactment did not comport with section 15's three readings requirements and is invalid, we do not reach the issue of whether Act 84's title "Relating to Public Safety" satisfies section 14's subject-in-title requirement.

because they do not have a concrete interest in challenging the constitutionality of Act 84's substance, but instead seek to bring a general challenge to the Legislature's practice of "gut[ting] and replac[ing]"[8] bills during the legislative process.[9]

We begin with the foundational premise that our democratic system of self-governance requires courts to limit judicial intervention "to those questions capable of judicial resolution and presented in an adversary context." Life of the Land v. Land Use Comm'n, 63 Haw. 166, 172, 623 P.2d 431, 438 (1981) (quoting Reliable Collection Agency, Ltd. v. Cole, 59 Haw. 503, 510, 584 P.2d 107, 111 (1978)). "[J]udicial intervention in a dispute is normally contingent upon the presence of a 'justiciable' controversy." Id. at 172, 623 P.2d at 438. A controversy is not justiciable unless "the party seeking a forum . . . has 'alleged such a personal stake in the

---

[8]    "Gut and replace" refers to the legislative practice of removing a bill's original content and replacing it with a different topic that is unrelated to the original bill.

[9]    We note that the State did not file a cross-appeal to challenge the circuit court's decision that Plaintiffs have standing in this case. Generally, an appellee who fails to file a cross-appeal cannot raise points of error. First Ins. Co. v. A&B Properties, 126 Hawai'i 406, 413 n.12, 271 P.3d 1165, 1172 n.12 (2012). However, because standing is a prudential consideration related to concerns of judicial self-governance, "Hawai'i state courts may consider standing even when not raised by the parties[.]" Tax Found. of Hawai'i v. State, 144 Hawai'i 175, 192, 439 P.3d 127, 144 (2019), reconsideration denied, No. SCAP-16-0000462, 2019 WL 1858284 (Haw. Apr. 25, 2019).

13

outcome of the controversy' as to warrant his invocation of . . . (the court's) jurisdiction and to justify exercise of the court's remedial powers on his behalf." Id. at 172, 623 P.2d at 438 (quoting Warth v. Seldin, 422 U.S. 490, 498-99 (1975). "[T]he issue of standing is reviewed de novo on appeal." Tax Found., 144 Hawai'i at 185, 439 P.3d at 137 (quoting Mottl v. Miyahira, 95 Hawai'i 381, 388, 23 P.3d 716, 723 (2001) (internal citation omitted)).

Plaintiffs filed suit seeking a declaration that the process for adopting Act 84 violated the Hawai'i Constitution. Accordingly, Plaintiffs' suit for declaratory relief is governed by HRS § 632-1 (2016).[10] See Ching v. Case, 145 Hawai'i 148, 173 n.41, 449 P.3d 1146, 1171 n.41 (2019)) (observing that "suits seeking retrospective declaratory relief based on an alleged constitutional violation that has already occurred are governed

---

[10]    HRS § 632-1 provides in relevant part:

> (b) Relief by declaratory judgment may be granted in civil cases . . . where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein, and the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.

by HRS § 632-1").  In Tax Found., this court held that a party seeking declaratory relief under HRS § 632-1 need not satisfy the common law three-part injury-in-fact test to have standing.[11] 144 Hawaiʻi at 189, 439 P.3d at 141.  Instead, we adopted the following test for HRS § 632-1 standing:

> [A] party has standing to seek declaratory relief in a civil case brought pursuant to HRS § 632-1 (1) where antagonistic claims exist between the parties (a) that indicate imminent and inevitable litigation, or (b) where the party seeking declaratory relief has a concrete interest in a legal relation, status, right, or privilege that is challenged or denied by the other party, who has or asserts a concrete interest in the same legal relation, status, right, or privilege; and (2) a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.

Id. at 202, 439 P.3d at 154.  Applying this test, we found that the plaintiff in Tax Found. had HRS § 632-1 standing "based on its historical purpose as a government financial accountability watchdog."  Id. at 202-03, 439 P.3d at 154-55.

Here, the circuit court held that Plaintiffs had standing to challenge Act 84 as "organizations that are dedicated to ensur[ing] integrity in the legislative process, and that is what this case is about."  Applying the standing

---

[11]    As stated in Tax Found.,

> the common law three-part "injury in fact" test for standing . . .  requires a showing that (1) the plaintiff has suffered an actual or threatened injury as a result of the defendant's conduct, (2) the injury is fairly traceable to the defendant's actions, and (3) a favorable decision would likely provide relief for the plaintiff's injury.

144 Hawaiʻi at 188, 439 P.3d at 140.

15

requirements delineated in Tax Found. to the facts of this case, we hold that Plaintiffs have HRS § 632-1 standing because: (1) antagonistic claims exist between Plaintiffs and the State with respect to whether the process used to adopt Act 84 violated the Hawaiʻi Constitution and Plaintiffs have a concrete interest in ensuring that the Legislature adheres to constitutionally-mandated procedures when enacting new legislation, which is an alleged right challenged or denied by the State;[12] and (2) "a declaratory judgment will serve to terminate the . . . controversy giving rise to the proceeding." See id. at 202, 439 P.3d at 154.  Accordingly, the circuit court did not err in finding that Plaintiffs have standing to challenge the constitutionality of Act 84.

---

[12]     The State cites no authority for its claim that Plaintiffs' interest in ensuring that the Legislature comply with constitutionally-mandated procedures when enacting new laws is not sufficiently concrete to warrant HRS § 632-1 standing.  Plaintiffs are community groups who are interested in increasing public participation in government, have a documented interest in legislative procedure and governance, and have consistently communicated their concerns about the Legislature's compliance with constitutionally-mandated procedures for enacting legislation.

     The plain language of HRS § 632-1(b) provides that a court may grant a declaratory judgment where antagonistic claims exist between the parties, specifically where "a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party."  Consequently, Plaintiffs need not disagree with the subject of Act 84 in order to assert their right to be governed by laws which have complied with constitutionally-mandated procedures for enacting legislation — a right which the Legislature allegedly denied.

**B.   Whether the Legislature complied with constitutional limitations on the legislative process is justiciable**

Both the State and the Legislature argue that this case raises nonjusticiable political questions.  The State concedes that whether the process of enacting Act 84 complied with constitutional requirements for the legislative process is justiciable, but contends that this court may not comment on the legislative practice of "gut and replace" or provide any guideline for what constitutes a permissibly germane amendment without violating the separation of powers.

In its amicus brief, the Legislature argues that if this court invalidates Act 84, it will intrude upon the Legislature's constitutional mandate to "determine the rules of its own proceedings[.]"  Haw. Const. art. III, § 12 ("section 12").[13]  The Legislature maintains that this court may look no further than determining whether the Legislature followed its own procedural rules to ascertain whether the three readings requirement is satisfied without violating the separation of powers doctrine.  See Hussey v. Say, 139 Hawai'i 181, 188-89, 384 P.3d 1282, 1289-90 (2016) (holding that whether a legislator is qualified to hold office is nonjusticiable

---

[13]    Section 12 provides in relevant part: "Each house shall choose its own officers, determine the rules of its proceedings and keep a journal."  Haw. Const. art. III, § 12.

because section 12 grants the Legislature the exclusive authority to judge the qualifications of its members).  The Legislature insists that there is no judicially discoverable or manageable standard, aside from the Legislature's own rules of procedure, for this court to decide whether the three readings requirement was satisfied and therefore the question is nonjusticiable.

As this court has previously noted,

> The separation of powers doctrine is embodied in the Guarantee Clause, article IV, section 4 of the United States Constitution, which reads:
>
>> The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.
>
> Questions arising under the Guarantee Clause are nonjusticiable because they are "political, not judicial, in character, and thus are for the consideration of the Congress and not the courts."  Ohio v. Akron Metro. Park Dist. for Summit County, 281 U.S. 74, 79-80 (1930) (citations omitted).

Taomae v. Lingle, 108 Hawai'i 245, 256-57, 118 P.3d 1188, 1199-1200 (2005).  Like the federal government, ours is a tripartite government in which the sovereign power is equally divided among the branches.  Trustees of Office of Hawaiian Affairs v. Yamasaki, 69 Haw. 154, 170-71, 737 P.2d 446, 456 (1987).

"The [political question] doctrine is the result of

the balance courts must strike in preserving separation of powers yet providing a check upon the other two branches of government."  Nelson v. Hawaiian Homes Comm'n, 127 Hawai'i 185, 194, 277 P.3d 279, 288 (2012).  Arguably, the political question doctrine is "the most amorphous aspect of justiciability."  Id. (internal quotation marks and citation omitted).  As the Supreme Court of the United States observed,

> Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of [the] Court as ultimate interpreter of the Constitution.

Baker v. Carr, 369 U.S. 186, 211 (1962).  Political questions are presented in specific formulations:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
>
> Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence.

Id. at 217 (emphasis added).

Despite the Legislature's protestations, the claim that this case presents a nonjusticiable political question is

19

groundless.  This court has consistently rejected the argument that alleged violations of constitutional mandates concerning the legislative process are nonjusticiable political questions.  See, e.g., Taomae, 108 Hawai'i at 256-57, 118 P.3d at 1199-1200 (addressing whether a constitutional amendment satisfied the constitutional three readings requirement); Schwab, 58 Haw. 25, 30-39, 564 P.2d 135, 139-44 (1977) (addressing whether a bill satisfied the constitutional three readings and subject-in-title requirements).  At bottom, it is the responsibility of this court to interpret the Hawai'i Constitution.  See Marbury v. Madison, 5 U.S. 137, 177 (1803) ("[A]n act of the legislature, repugnant to the constitution, is void. . . .  It is emphatically the province and duty of the judicial department to say what the law is."); Sierra Club, 120 Hawai'i at 196, 202 P.3d at 1241 (noting that "judicial review of legislative enactments is appropriate" because "[o]ur ultimate authority is the Constitution; and the courts, not the legislature, are the ultimate interpreters of the Constitution.") (internal quotation marks and citations omitted).

While the Legislature is empowered by section 12 to enact its own rules of procedure, that power is not without limits.  The Legislature's "power shall extend to all rightful subjects of legislation not inconsistent with this

20

constitution[.]"  Haw. Const. art. III, § 1 (emphasis added).

Put simply, the Legislature's rules of procedure do not trump

constitutional provisions.  Instead, constitutional provisions

control over any provision of adopted rules.  See Nat'l

Conference of State Legislatures, <u>Mason's Manual of Legislative

Procedure</u> (2010 ed.) §§ 4, 6, 10, and 12) ("<u>Mason's Manual</u>").[14]

Accord Norman J. Singer & Shambie Singer, 1 <u>Sutherland on

Statutes and Statutory Construction</u> § 7:4 (7th ed. 2014)

("<u>Sutherland</u>") ("The constitution empowers each house to

determine its rules of proceedings.  It may not by its rules

ignore constitutional restraints[.]" (quoting <u>United States v.

Ballin</u>, 144 U.S. 1, 5 (1892)).  Accepting the Legislature's

contrary proposition would violate the separation of powers

doctrine, effectively leaving the Legislature's power

---

[14]     <u>Mason's Manual</u>, which the Legislature adopted, provides in relevant part:

> § 4 ¶ 4.  [W]here the constitution requires three readings of bills, this provision controls over any provision of adopted rules, statutes, adopted manual or parliamentary law.
>
> § 6 ¶ 2.  A constitutional provision regulating procedure controls over all other rules of procedure.
>
> § 10 ¶ 3.  The power of each house of a state legislature to make its own rules is subordinate to the rules contained in the constitution.
>
> § 12 ¶ 1.  A legislative body cannot make a rule that evades or avoids the effect of a rule prescribed by the constitution governing it, and it cannot do by indirection what it cannot directly do.

unchecked.[15]

While Section 12 empowers the Legislature to adopt its own rules of procedure, it contains no "textually demonstrable constitutional commitment" to the Legislature to interpret other constitutional mandates, such that determining whether Act 84 complied with those mandates is a nonjusticiable political question. See Baker, 369 U.S. at 217 (noting that where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department[,]" the case raises a political question). The Legislature's reliance on Hussey, 139 Hawaiʻi at 188-89, 384 P.3d at 1289-90, is misplaced because that case concerned a challenge to a state legislator's qualifications for office and section 12 provides that "'[e]ach house shall be the judge of the . . . qualifications of its own members.'" However, sections 14 and 15 contain no similar language vesting the Legislature with the responsibility to judge its own compliance with the constitutional requirements

---

[15]    As we observed in Morita v. Gorak:

> Under longstanding canons of statutory construction, "if one construction would make it possible for a branch of government substantially to enhance its power in relation to another, while the opposite construction would not have such an effect, the principle of checks and balances would be better served by a choice of the latter interpretation."

145 Hawaiʻi 385, 395, 453 P.3d 205, 215 (2019) (quoting Staebler v. Carter, 464 F.Supp. 585, 599-600 (D.D.C. 1979)).

for the legislative process.

Accordingly, we conclude that this court may determine whether the process used to enact Act 84 complied with the constitutional mandates concerning the legislative process without the violating separation of powers doctrine.[16]

## C.   The process used to enact Act 84 did not comply with section 15

Having determined that Plaintiffs have standing to bring suit and that this court can decide the issue without violating the separation of powers doctrine, we now consider the merits of Plaintiffs' challenge.

"No bill shall become law unless it shall pass three readings in each house on separate days." Haw. Const. art. III, § 15. Constitutional provisions regarding the enactment of legislation are "mandatory and a violation thereof would render

---

[16]   Other jurisdictions have similarly rejected the claim that a court cannot review the constitutionality of a law's enactment without violating the separation of powers. See, e.g., Magee v. Boyd, 175 So.3d 79, 106 (Ala. 2015) (holding that whether the legislature satisfied constitutionally mandated procedural requirements for enacting new laws is justiciable); Bevin v. Commonwealth ex rel. Beshear, 563 S.W.3d 74, 86 (Ky. 2018) ("We are satisfied that judicial review of the meaning of any provision of the Kentucky Constitution is well within the separate powers assigned the judicial branch and that the question before us is not a non-justiciable political question."); Pennsylvania Sch. Boards Ass'n, Inc. v. Commonwealth Ass'n of Sch. Adm'rs, Teamsters Local 502, 805 A.2d 476, 485 (Pa. 2002) (holding that whether a bill complied with the state constitution's three readings requirement was justiciable); Brewer v. Burns, 213 P.3d 671, 675 (Ariz. 2009) (rejecting the argument that a constitutional provision requiring the legislature to determine its own rules of procedure limited the court's ability to determine whether the legislature complied with other constitutional mandates concerning the legislative process).

an enactment nugatory." Schwab, 58 Haw. at 31, 564 P.2d at 139. Plaintiffs argue that Act 84 did not satisfy the three readings requirement because the hurricane shelter version of S.B. 2858 only received one reading in the Senate before it was signed into law.

We begin with the presumption that every enactment of the Legislature was adopted in accordance with the Constitution. See id. at 31, 564 P.2d at 139. Plaintiffs, as challengers of Act 84, bear the "burden of showing unconstitutionality beyond a reasonable doubt." See id. Thus, Act 84 will not be invalidated unless the Plaintiffs demonstrate that it was enacted in violation of section 15's three-readings requirement and the violation is "plain, clear, manifest, and unmistakable." See id.

> When interpreting constitutional provisions,
>
> the general rule is that, if the words used in a constitutional provision are clear and unambiguous, they are to be construed as they are written. In this regard, the settled rule is that in the construction of a constitutional provision the words are presumed to be used in their natural sense unless the context furnishes some ground to control, qualify, or enlarge them.

Sierra Club, 120 Hawaiʻi at 196, 202 P.3d at 1241 (cleaned up). Section 15 states that "[n]o bill shall become law unless it shall pass three readings in each house on separate days." Haw. Const. art. III, § 15 (emphasis added). The ordinary meaning of the word "read" is "to receive or take in the sense of [letters

24

or symbols] . . . by sight" or "to utter aloud the printed or written words of" something.  Merriam Webster's Collegiate Dictionary 972 (10th ed. 1994).  Thus, before a bill can become a law, it must be read, meaning that its contents must be "take[n] in" or "utter[ed] aloud" three times in each house on separate days.  See Haw. Const. art. III, § 15.

The State argues that the process used to enact Act 84 complied with the plain language of section 15 because the bill number and title were read three times in each house on three separate days.  Every bill consists of a number, title, and the substance of the bill which is contained in its body and divided into sections.[17]  However, because the Legislature's rules of procedure permit a bill to be "read" by title only,[18] we must consider whether a bill is the same bill for purposes of the three readings requirement, once the bill is amended so that it addresses an entirely new subject.

We conclude that the words in section 15 are clear and

_____

[17]     Legislative Reference Bureau, Anatomy of a Bill, https://lrb.hawaii.gov/par/overview-of-the-legislative-process/types-of-measures-bills-resolutions-messages/anatomy-of-a-bill.

[18]     Pursuant to the Rules of the House of Representatives (2017-18), Rules 34-36, all three readings of a bill may be by "title only."  Pursuant to the Rules of the Senate (2017-18), Rules 48-50, the first Senate reading of a bill is "for information," with the second and third readings permissibly being by "title only."  See also Mason's Manual, supra, at § 720 ¶ 4 ("A reading of a bill by title is considered a reading of the bill, unless it is specifically required by the constitution that the bill be read at length or in full.").

unambiguous.  For the reasons stated herein, we conclude that
Act 84 is invalid because the hurricane shelter version of S.B.
2858 did not receive three readings in the Senate before the
bill was signed into law.

1.    **The purpose of the three readings requirement**

A fundamental principle of constitutional
interpretation is that

> the Hawaiʻi Constitution must be construed with due regard
> to the intent of the framers and the people adopting it,
> and the fundamental principle in interpreting a
> constitutional provision is to give effect to that intent.

Sierra Club, 120 Hawaiʻi at 196, 202 P.3d at 1241.  Accordingly,
we consider the purpose of the three readings requirement in
order to effectuate the intent of the framers and the people.

In Hawaiʻi, the three readings requirement dates back
to the 1894 Constitution of the Republic of Hawaiʻi.  Haw. Const.
art. 64 (Rep. 1894).  In 1950, the three readings requirement
was reworded to the current language: "No bill shall become law
unless it shall pass three readings in each house,[19] on separate
days."  Haw. Const. art. III, § 16 (1950).

At the Constitutional Convention of 1950, the
Committee on Revision, Amendments, Initiative, Referendum and
Recall ("the Committee") issued a report which discussed, among

---

[19]    The Constitutional Convention of 1968 deleted the comma preceding "on
separate days" and renumbered this section to section 15.  Haw. Const. art.
III, § 15.

other things, the merits of the legislative process in a representative form of government.  Stand. Comm. Rep. No. 47 in 1 Proceedings of the Constitutional Convention of Hawaii 1950, at 182 (1960) ("Proceedings of 1950").  The Committee observed that laws should not be enacted in response to "storms of hasty, temporary and changeable public emotion."  Id. at 183.  Rather, "[e]xcept in time of war and equally urgent disaster or crisis, laws should be drawn . . . with deliberation and careful consideration of long-range needs[.]"  Id.

The Committee also made this observation about the role of the three readings requirement in the legislative process:

> One of the necessary features of laws adopted by the legislature is the necessity for three readings and the opportunity for full debate in the open before committees and in each House, during the course of which the purposes of the measures, and their meaning, scope and probable effect, and the validity of the alleged facts and arguments given in their support can be fully examined and, if false or unsound, can be exposed, before any action of consequence is taken thereon.

Id. at 184 (emphasis added).  Once a full and informed debate uncovers a bill's "weaknesses, or opposition forces compromise to meet objections raised to its form or substance[,]" the bill "may be amended any number of times[.]"  Id.  Thus, as we have previously observed, a historical purpose of the three readings

requirement is to "provide[] the opportunity for full debate."[20]

Taomae, 108 Hawaiʻi at 255, 118 P.3d at 1198.[21]

As we have previously observed, the three readings requirement "also ensures that each house of the legislature has given sufficient consideration to the effect of the bill."  Id.; see also Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 396 (1951) (Jackson, J. concurring) (concluding that the three-readings requirement in the United States Constitution is "intended . . . to make sure that each House knows what it is passing and passes what it wants").  Additionally, the constitutional requirement that the three readings must occur on three separate days is generally intended "to prevent hasty and ill-considered legislation, surprise or fraud, and to inform the legislators . . . of the contents of the bill."  Mason's Manual,

---

[20]    This is also in accordance with the common law understanding of reading requirements.  "Reading requirements are supposed to facilitate informed and meaningful deliberation on legislative proposals, and refinement and modification of the text of a proposal is the natural and desirable product of deliberation."  Sutherland, supra, § 10:4.

[21]    This court previously addressed the three readings requirement as it relates to constitutional amendments in Taomae, 108 Hawaiʻi at 254, 118 P.3d at 1197.  At issue in Taomae was a bill that was originally introduced as "A Bill for an Act Relating to Sexual Assault" and was later amended to add a "constitutional amendment to allow the Legislature to define what behavior constitutes a continuing course of conduct in sexual assault crimes[.]"  Id. at 248-49, 118 P.3d at 1191-92.  This court held that the proposed constitutional amendment violated section 15 because the bill did not receive the required three readings in each house after the constitutional amendment provision was added.  Id. at 255, 118 P.3d at 1198.  Therefore, Taomae is distinguishable from this case because constitutional amendments must comply not only with article III, but also with article XVII.  See id. at 251, 118 P.3d at 1194.

supra, at § 720 ¶ 2.  Accord 1 Thomas Cooley, A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union 288 n.1 (Walter Carrington ed., 8th ed. 1927) (noting that the purpose of the three readings requirement is "to prevent hasty and improvident legislation").

Another key purpose of the three readings requirement is that it provides the public notice of proposed legislation and an opportunity to comment.  See Alaska Legislative Council v. Knowles, 21 P.3d 367, 377 (Alaska 2001) (observing that the three readings requirement provides "an opportunity for the expression of public opinion and due deliberation."); Mason's Manual, supra, § 720 ¶ 2 (noting that the three readings requirement is also intended "to inform . . . the public of the contents of the bill"); 1 Sutherland, supra, § 10:4 ("The practice of having bills read on three different days also serves to provide notice that a measure is progressing through the enacting process, enabling interested parties to prepare their positions.").  See also Cooley, supra, at 288 n.1 (noting that the three readings requirement is "not a mere rule of order, but one of protection to the public interests and to the citizens at large").

Thus, the three readings requirement serves three

important purposes: it (1) provides the opportunity for full debate on proposed legislation; (2) ensures that members of each legislative house are familiar with a bill's contents and have time to give sufficient consideration to its effects; and (3) provides the public with notice and an opportunity to comment on proposed legislation.

Despite the fact that the history of the Constitutional Convention of 1950 characterizes the three readings requirement as a "necessity" which provides "the opportunity for <u>full debate</u> in the open . . . during the course of which the <u>purposes of the measures</u>, and their meaning, scope and probable effect, and the validity of the alleged facts and arguments given in their support can be <u>fully examined</u>" before a bill is voted on, 1 Proceedings of 1950, <u>supra</u>, at 184 (emphasis added), the State contends that the "history of the 1950 Constitution does not provide any particular insight[.]"

Instead, the State argues that the history of the Constitutional Convention of 1968 "is more informative." In 1968, the framers inserted a "final printing requirement" directly after the three readings requirement: "No bill shall pass third or final reading in either house unless <u>in the form to be passed it shall have been printed</u> and made available to

the members of that house for at least twenty-four hours."[22] Haw. Const. art. III, § 16 (1968) (emphasis added).  The State argues that by adding the final printing requirement in 1968, the framers implicitly acknowledged that bills would be amended during the legislative process and that even significant amendments would not require the three readings to begin anew.

On the contrary, the constitutional history of the final printing requirement demonstrates that it was intended to further the same purposes as the three readings requirement. According to the Committee on Legislative Powers and Functions, the purpose of the final printing requirement

> is to assure members of the legislature an opportunity to take informed action on the final contents of proposed legislation. . . .  "Form to be passed" means the form in which a bill is passed on third reading in each house,

---

[22]     In 1978, the section which contains the three readings requirement was amended to its current form.  The twenty-four-hour period was increased to forty-eight hours, the printing requirement was slightly reworded, and the sections were renumbered.  Thus, section 15 now states:

> No bill shall become law unless it shall pass three readings in each house on separate days.  No bill shall pass third or final reading in either house unless printed copies of the bill in the form to be passed shall have been made available to the members of that house for at least forty-eight hours.
> Every bill when passed by the house in which it originated, or in which amendments thereto shall have originated, shall immediately be certified by the presiding officer and clerk and sent to the other house for consideration.
> Any bill pending at the final adjournment of a regular session in an odd-numbered year shall carry over with the same status to the next regular session.  Before the carried-over bill is enacted, it shall pass at least one reading in the house in which the bill originated.

Haw. Const. art. III, § 15.

> concurrence of one house to amendments made by the other, and the form in which a bill is passed by both houses after conference on a bill. The [final printing requirement] not only aids the legislator but also <u>gives the public additional time and opportunity to inform itself of bills facing imminent passage</u>.

Stand. Comm. Rep. No. 46 in 1 Proceedings of the Constitutional Convention of Hawaii 1968, at 216 (1973) ("Proceedings of 1968") (emphasis added). The final printing requirement was adopted to provide additional notice to legislators and the public in the face of increasingly complex legislation.

> The complexity of modern legislation, particularly with the development of omnibus bills in such broad fields as the budget, tax reform, administrative organization, workmen's compensation . . . frequently causes amendments to such bills to be highly technical in nature yet far-reaching in effect.

<u>Id.</u>

Nothing in the history from the Constitutional Convention of 1968 evidences an intent by the framers for the final printing requirement to alter the three readings requirement or diminish its importance. Rather, the framers considered the final printing requirement to be a "substantial contribution" which would "increase[e] awareness and understanding of proposed legislation[.]"[23] <u>Id.</u> The framers envisioned that the final printing requirement would allow

---

[23] In considering whether to adopt the final printing requirement, the 1968 Committee on Revision, Amendment and Other Provisions noted that it "was guided by the belief that any change in procedure must be evaluated in terms of its contribution to the two principal legislative functions of representing people, groups and communities and of rendering decisions which can be accepted as carefully weighed and fairly made." <u>Id.</u>

legislators to consult with others, both inside and outside of the Legislature, when the subject matter of a bill "proves too technical to be understood just by reading[.]"  Id.  "The importance of interest groups and their representatives to the legislative process as sources of information and barometers of public support for proposed legislation is unquestioned. . . . [T]he [final printing requirement] enhances the functions served by these groups."  Id. (emphasis added.)

The State relies heavily on floor remarks made by delegates at the Constitutional Convention of 1968 in support of its claim that the addition of the final printing requirement was intended to ensure that legislators had "sufficient time to review amended legislation without any need for an additional three readings."  First, the State cites to remarks made by Delegate Hung Wo Ching:

> The original intent of a bill having passed one house can be substantially changed in legislative conferences.  A bill in final form can then pass third reading in both houses without a reasonable opportunity for members of the legislature and the public for review in its final form. To correct this situation, our proposed bill will require that a bill be printed in its final form and be made available to the legislators and to the public for a least 24 hours before final passage.

Comm. of the Whole Debates in 2 Proceedings of the Constitutional Convention of Hawaii of 1968, at 145 (1972).

Second, the State cites Delegate Donald Ching's answer when asked if a conference substituted bill would have to pass

three readings:

> The proposed amendment will not change the manner in which a bill is handled . . . the only change that will be brought about is — that after the conference committee has deliberated and come up with its conference draft, that draft will have to be printed and lay on the table for 24 hours or be made available to the members and the public for 24 hours before either house can act on it. . . . As to what is substituted or what will happen in there, there will be no change as from the present procedure.

Id. at 146.

Finally, the State cites remarks by Delegate Charles

E. Kauhane (Delegate Kauhane):

> When the bill comes out of the committee, we send an elephant into the committee in the first instance. . . . The committee recommends that the bill pass third reading in its amended form.  You may have intended to request consideration of the matter of the caring of elephants. This bill comes out with the caring of the elephants, dogs, pigeons and what not and then we are voting on third reading for the passage of a completely new bill.

Id. at 169 (emphasis added).  Delegate Kauhane described the

final printing requirement as an attempt to ensure that

legislators had the opportunity to offer amendments to the

amended bill before its third reading and "to prevent any

citizen from going into court to test the constitutionality of

the legality of the passage of this bill on third reading in

this disguised form."  Id.  "[I]n order to plug that loophole

and to make sure that all of these actions undertaken by the

legislature are legal and beyond any question of doubt have met

the conditions under which those are to be considered, first,

second and third reading."  Id.

The State's reliance on these floor remarks is misplaced. First, nothing in the cited floor remarks indicates an intent to change the meaning of the three readings requirement as adopted by the Constitutional Convention of 1950. Second, the understanding of subsequent delegates does not change the meaning of an existing constitutional provision, absent a substantive amendment to the law. See Peer News LLC v. City & County of Honolulu, 138 Hawai'i 53, 73, 376 P.3d 1, 21 (2016) (noting that courts "should be wary of bootstrapping" the intent of a latter legislature onto a previous legislature) (internal quotation marks and brackets omitted); 2A Sutherland, supra, § 48:20 ("[C]ourts generally give little or no weight to the views of members of subsequent legislatures about the meaning of acts passed by previous legislatures.") (footnote omitted). Finally, even if floor remarks by individual delegates at the 1968 Convention did express an intent to change the meaning of the three readings requirement by adopting the final printing requirement, "remarks by individual legislators are not attributable to the full legislature that voted for the bill, and as such are less reliable indicators of legislative intent." Peer News, 138 Hawai'i at 71, 376 P.3d at 19.

Moreover, the State's claim that floor remarks by delegates at the Constitutional Convention of 1968 evidenced an

intent to change the three readings requirement is directly contradicted by the committee report explaining the purpose of the final printing requirement. The final printing requirement was added to "assure members of the legislature an opportunity to take informed action on the final contents of proposed legislation[,]" which increasingly included highly technical and complicated amendments. 1 Proceedings of 1968, supra, at 216. "The [final printing requirement] not only aids the legislator but also gives the public additional time and opportunity to inform itself of bills facing imminent passage." Id. Logically, in order to serve their twin functions of providing legislators with information about complicated amendments and acting as "barometers of public support," both the public and interest groups must be able to track proposed legislation through all three required readings. See id. Indeed, the final printing requirement was aimed squarely at providing both legislators and the public with notice of amendments between the second and third reading.

The State's argument is further undercut by the reasons stated by framers at the Constitutional Convention of 1978 for increasing the time that a bill must be made available in printed form prior to voting to forty-eight hours. The final printing requirement waiting period was enlarged to address "the

increasing numbers of bills being introduced in the legislature and the public concern expressed on the difficulty of <u>following the many bills</u> through the legislature in the closing days of the session[.]"  Stand. Comm. Rep. No. 46 in 1 Proceedings of the Constitutional Convention of Hawaii of 1978, at 603 (1980) ("Proceedings of 1978") (emphasis added).  The framing delegates believed that allowing an additional twenty-four hours "during which a legislator or a constituent could review a bill before third or final reading, would help both legislator and constituent to <u>avoid hasty decisions and surprises</u> regarding the bill."  <u>Id.</u> (emphasis added).  Thus, the final printing requirement presupposes a robust three readings rule and was intended to enhance the rule, rather than to diminish the importance of the first two readings.

As to the State's claim that section 15 merely requires that a bill be read by number and title in each house on three separate days, this "plain language" argument ignores the principle that constitutional provisions must be construed "with due regard to the intent of the framers and the people adopting it."  <u>See</u> <u>Sierra Club</u>, 120 Hawai'i at 196, 202 P.3d at 1241 (cleaned up).  The State's assertion that the three readings requirement is satisfied merely by a perfunctory reading three times in each house, with the final reading after

forty-eight hours' notice, seems to ignore the framers' intent in adopting the provision.

This court has previously observed that "[t]he three-reading requirement not only provides the opportunity for full debate; it also ensures that each house of the legislature has given sufficient consideration to the effect of the bill." Taomae, 108 Hawai'i at 255, 118 P.3d at 1198. The framers at the 1950 Convention envisioned that, during the course of debate, a bill's "purposes[,] . . . meaning, scope and probable effect" would be "fully examined[.]" 1 Proceedings of 1950, supra, at 184. The framers considered the ability to amend a bill "any number of times after debate discloses its weaknesses, or opposition forces compromise to meet objections raised to its form or substance[]" one of the key benefits of the legislative process. Id. Thus, the constitutional history of the three readings requirement demonstrates that the framers intended it to further the aim of a deliberative legislative process, wherein legislators would receive input from an informed public, debate a bill's merits and weaknesses, and amend bills to address those uncovered weaknesses.

In sum, the constitutional history of the three readings requirement indicates that the framers intended the rule to provide notice of a bill's contents, facilitate informed

debate, prevent hasty legislation, and provide the public with notice and an opportunity to comment on proposed legislation. In order to effectuate this intent, a bill must retain some common attributes between readings.  Thus, we are convinced that in order to satisfy the three readings requirement, a bill at each subsequent reading must bear some resemblance to the previous versions read beyond merely having the same title and number.

**2.    We adopt the same germaneness standard for section 15 that applies to section 14**

Having decided that the three readings requirement necessitates that the substance of a bill must bear some resemblance to earlier versions in order to constitutionally pass the third and final reading, we next consider what level of similarity section 15 requires.  Plaintiffs argue that, in order to effectuate the purpose of the three readings requirement and satisfy section 15, this court should adopt a germaneness standard for bill amendments.  Plaintiffs propose that the "test [for germaneness] is whether the amendments are germane to the bill as previously read."  Under Plaintiffs' proposed standard, a reviewing court should consider whether the amendments and the original bill constitute a unifying scheme to accomplish a

single purpose.[24]  Plaintiffs contend that the three readings
must begin anew when the Legislature makes non-germane
amendments to a proposed bill.

There is a long tradition in Hawaiʻi law of applying a
germaneness standard to constitutional requirements for
legislating.  The Territorial Supreme Court applied a
germaneness standard to the single subject rule[25] in Territory v.
Kua, 22 Haw. 307 (1914).  The Kua court noted that germane
literally means "akin, closely allied[,]" and "united by the
common tie of blood or marriage."  Id. at 313 (internal citation

---

[24]    Plaintiffs cite the germaneness test applied to the constitutional
three readings requirement by the Pennsylvania Supreme Court in Washington v.
Dep't of Public Welfare, 188 A.3d 1135 (Pa. 2018).  As the Pennsylvania
Supreme Court explained,

> Amendments are germane to the original general
> subject matter of a bill if both the subject of the
> amendments and the subject of the original contents of the
> bill have a nexus to a common purpose.  In other words, the
> subject of the amendments and the subject of the original
> bill language must constitute a unifying scheme to
> accomplish a single purpose.  In making this determination,
> a reviewing court may hypothesize a reasonably broad
> unifying subject; however, such a hypothetical subject
> cannot be unduly expansive, lest the purpose of the
> constitutional provision be defeated.

Id. at 1151-52 (internal citations and quotation marks omitted).
    Notably, Pennsylvania is one of a minority of states whose
constitutions contain an explicit provision that "no bill shall be so altered
or amended, on its passage through either House, as to change its original
purpose."  Pa. Const. art. III, § 1.  Pennsylvania's "original purpose"
requirement is in addition to its connotational three readings requirement
contained in article III, § 4.  We note that the Hawaiʻi Constitution contains
no "original purpose" provision.

[25]    "That each law shall embrace but one subject, which shall be expressed
in its title."  Organic Act § 45 (1900) (emphasis added).

and quotation marks omitted). In applying this personified definition of germaneness to legislative provisions, "the common tie is found in the tendency of the provision to promote the object and purpose of the act to which it belongs." Id. (internal citation and quotation marks omitted). At issue in Kua was whether a law preconditioning the issuance of an occupational license on the payment of all of the applicant's taxes was germane to a law which was titled, in part, "Relating to the Issuance of Licenses" that regulated which government authority would issue those same licenses. Id. at 308-09. The Kua court concluded that there was "no close alliance" between the tax provision and the issuing authority provision and that requiring occupational license applicants to pay all taxes "is a new and independent matter, disconnected from the question as to who shall issue the license, and, therefore, is not germane to the subject of the act." Id. at 313 (emphasis added). Thus, the Kua court held that the tax provision was void because it violated the single subject provision. Id. at 317.

The State maintains that nothing in the plain language of section 15 or its constitutional history requires bill amendments to be germane to a bill's original language. The State argues that the Legislature's own procedural rules, which are entitled to deference, explicitly state that the three

41

readings need not restart after an amendment or substitution. The State maintains that germaneness is measured solely in relation to the single subject and subject-in-title requirements. The State insists that applying a germaneness standard to the three readings requirement is unworkable because "establishing a universal definition of 'germane' is a futile endeavor" and would consequently violate the separation of powers doctrine as courts set "arbitrary limits on 'how much' a bill can be amended." Finally, the State argues that other important policy considerations counsel against applying a germaneness standard to the three readings requirement, claiming that it would hinder the Legislature's ability to make laws and respond swiftly to extraordinary and sudden events and open the floodgates to new litigation.

For the following reasons, we agree with Plaintiffs that applying a germaneness standard to the three readings requirement best effectuates the plain meaning and purpose of this constitutional mandate.

First, applying a germaneness standard will effectuate both the plain language of the three readings requirement and the purposes for which it was adopted. Section 15 states that "[n]o bill shall become law unless it shall pass three readings in each house on separate days." Haw. Const. art. III, § 15

(emphasis added).  A bill consists of the number, title, and body.  Because the plain language of section 15 states that a bill must be read three times on separate days, it follows that if the body of the bill is so changed as to constitute a different bill, then it is no longer the same bill and the three readings begin anew.

Second, the germaneness standard is an established and enforceable standard and one which courts in Hawai'i have ably applied to the single subject and subject-in-title requirement for over a century.  See, e.g., Schwab, 58 Haw. at 33-34, 564 P.2d at 140-41 (applying the germaneness standard to the single subject requirement); Kua, 22 Haw. at 313 (applying the germaneness standard to the single subject requirement); Territory v. Dondero, 21 Haw. 19, 25 (1912) (considering whether the title of a city ordinance violated the city charter's subject-in-title provision and applying a germaneness standard).  Accordingly, the State's claim that it will be impossible for courts to apply a germaneness standard is without merit.[26]

Third, the purpose behind the single subject and

---

[26]    We note that the State offers no viable explanation for why germaneness applies to section 14 of article III, but not to section 15, or why germaneness is a workable standard for courts to apply to the former but not the latter.  We disagree with the State's assertion that a reviewing court would be unable to recognize when an amendment to a challenged bill is not germane to the bill's original subject, just as they recognize when a non-germane amendment violates the single subject or subject-in-title requirements.

subject-in-title requirements is similar to the purpose of the three readings requirement in that both are directed at providing notice to legislators and the public. Compare Schwab, 58 Haw. at 30-31, 564 P.2d at 139 (observing that the purpose of the single subject requirement is, inter alia, "to prevent surprise or fraud upon the Legislature[,]" and to provide notice to the public of proposed legislation) (quoting Jensen v. Turner, 40 Haw. 604, 607-08 (1954)), with Taomae, 108 Hawaiʻi at 255, 118 P.3d at 1198 (noting that one purpose of the three readings requirement is to "ensure[] that each house of the legislature has given sufficient consideration to the effect of the bill."). See also Mason's Manual, supra, § 720 ¶ 2 (noting that the three readings requirement is intended "to prevent hasty and ill-considered legislation, surprise or fraud, and to inform the legislators and the public of the contents of the bill."). Thus, it is sensible to apply the same germaneness standard to the three readings requirement as we do to the single subject and subject-in-title requirements because the germaneness standard is a safeguard against the same legislative pitfalls.

Nor are we alone in applying a germaneness standard to the constitutional three readings requirement. Numerous other jurisdictions also measure compliance with their constitutional

three readings requirements according to germaneness.[27]  This
includes states that, like us, do not include an "original
purpose" provision in their constitution.  See, e.g., Van Brunt
v. State, 653 P.2d 343, 345-46 (Alaska App. 1982) (holding that
the three readings requirement need not restart after a
substantial amendment, so long as the amendment is germane to
the bill); People ex rel. Cty. Collector of Cook Cty. v. Jeri,
Ltd., 239 N.E.2d 777, 779 (Ill. 1968) ("It is the rule in this
State, however, that amendments which are 'germane' to the
general subject of the bill as originally introduced may be made
without the proposed Act, as amended, having to be read on three
different days in each house."); Bevin, 563 S.W.3d at 90-91
(holding that a bill which was read by title only did not
satisfy the three readings requirement after a non-germane
amendment because the title did not convey any information about
the bill's contents); Hoover v. Bd. of County Comm'rs, 482
N.E.2d 575, 579-80 (Ohio 1985) ("[A]mendments which do not
vitally alter the substance of a bill do not trigger a

---

[27]    The only jurisdiction cited by the State which has a three readings
requirement and does not yet apply a germaneness standard is Tennessee.  In
D.M.C. Corp. v. Shriver, 461 S.W.2d 389, 392 (Tenn. 1970), the Tennessee
Supreme Court stated that "on third and final reading a bill can be amended
to any extent, even to striking the body of the bill and substituting the
amendment therefore so long as the amendment is germane to and within the
scope of the title." (Emphasis added.)  However, the Tennessee Supreme Court
held that the challenged bill was invalid because on the first two readings,
it contained no substance and consisted of only a title and number.  Id.

requirement for three considerations anew . . . [b]ut, [w]hen the subject or proposition of the bill is thereby wholly changed, it would seem to be proper to read the amended bill three times, and on different days[.]") (internal quotation marks and citation omitted); Hood v. City of Wheeling, 102 S.E. 259, 263 (W. Va. 1920) ("a substitute bill or amendment, if so germane to the original bill as to be a proper substitute or amendment, does not have to go back and be read three times, but may include as part of its required readings those had before the substitution or amendment was made.").[28]  It also includes minority states with an "original purpose" provision.  See, e.g., Magee v. Boyd, 175 So.3d 79, 114 (Ala. 2015) (holding that "an amended bill or a substitute bill, if germane to and not inconsistent with the general purpose of the original bill, does not have to be read three times on three different days to comply with [the three readings requirement]") (emphasis added);

―――――――――――――――――

[28]    The Dissent attempts to minimize these states' use of a germaneness standard to measure compliance with their three readings requirements by asserting that the standard is meant to "focus on whether the amendments are within the scope of the bill's original title."  Dissent at 24.  This is, of course, a logical first step to determining whether an amendment is germane to the original bill's subject matter insofar as constitutional single subject requirements mandate that bills pertain to a single subject.  See, e.g., Haw. Const. art. III, § 14.  However, that is not the end of the inquiry, as our sister courts go on to analyze whether the amended bill would accomplish a similar purpose.  See, e.g., Hood, 102 S.E. at 263 (explaining the three readings requirement is not violated when "[p]rovisions wholly discordant from the text [are] inserted by way of amendment, provided the main purpose and essential character of the original are not necessarily impaired or modified.") (emphasis added).

46

U.S. Gypsum Co. v. State Dep't of Revenue, 110 N.W.2d 698, 702 (Mich. 1961) (holding that a substituted bill was sufficiently germane for purposes of the three readings requirement because the "major purposes" of the substitute "were all within the original objectives of the bill as first introduced"); Washington, 188 A.3d at 1153-54 (holding that a gutted and replaced bill violated the three readings requirement because "amendments to such enfeebled legislation are not germane as a matter of law.").

Fourth, applying the germaneness standard to the three readings requirement is consistent with other constitutional limitations on the legislative process which are predicated on a meaningful interpretation of the three readings requirement. Notably, the mid-session recess,[29] the bill introduction deadline,[30] and the final printing requirement[31] all depend on the

---

[29] Article III, section 10 of the Hawai'i Constitution provides in relevant part: "Each regular session shall be recessed for not less than five days at some period between the twentieth and fortieth days of the regular session. The legislature shall determine the dates of the mandatory recess by concurrent resolution."

[30] Article III, section 12 of the Hawai'i Constitution provides in relevant part: "By rule of its proceedings, applicable to both houses, each house shall provide for the date by which all bills to be considered in a regular session shall be introduced."

[31] Article III, section 15 of the Hawai'i Constitution provides in relevant part: "No bill shall pass third or final reading in either house unless printed copies of the bill in the form to be passed shall have been made available to the members of that house for at least forty-eight hours." (Emphasis added.)

47

public's ability to monitor the progress of bills through the legislative process. These interdependent constitutional restrictions, which are meant to ensure public participation in the legislative process, would all be rendered meaningless under the State's interpretation of the three readings requirement.[32]

The requirement of a five-day mid-session recess was added to the Hawai'i Constitution in 1978 "to <u>provide</u> both <u>legislators and the public an opportunity to review</u> during the recess <u>all bills</u> that have been introduced in both houses, and an opportunity for both legislators and constituents to communicate on matters" pending. 1 Proceedings of 1978, <u>supra</u>, at 603 (emphasis added). The framers believed that the recess

---

[32] In adopting the State's "plain language" argument, the dissent places great reliance on the subject-in-title requirement and on a bill's title to provide notice to the public. Dissent at 24-25. However, as Plaintiffs observed, the title "Related to Public Safety" has been used in past legislative sessions for a plethora of subjects, including:

> shipping container inspections for fireworks (H.B. 7, 2017); establishing a medical marijuana commission to make recommendations about dispensaries (H.B. 2534, 2016); installation of residential fire protection sprinkler systems (S.B. 2170, 2016); prohibiting general contractors from performing the work of a specialty contractor without a license (H.B. 130, 2015); appropriating funds for the repair of a Waikīkī seawall (H.B. 84, 2011); imposing a tort duty on private landowners to inspect and mitigate where there is a potential danger of falling rocks (H.B. 1261, 2003).

Thus, we disagree that the subject-in-title requirement alone is sufficient to ensure that new legislation is not introduced after the bill introduction deadline in order to allow the public and legislators to use the mid-session recess to read all of the bills that will be introduced in the legislative session.

would allow the public to "become acquainted with and follow the bills through the legislature more intelligently."  Id.

The bill introduction deadline was also added in 1978 to "allow the public the use of the mandatory 5-day recess to review every bill that will ever be introduced in that legislative session."  Id. (emphasis added).  In 1984, the bill introduction deadline was amended to allow the Legislature to set an earlier deadline and prefile bills before session started to afford the public more time to familiarize itself with proposed legislation, conduct research, and "prepare more thoughtful and detailed testimony."  Stand. Comm. Rep. No. 417-84, in 1984 House Journal at 1031.  Logically, it would be futile for the public to use the mid-session recess to read every bill that would be introduced in the session in both houses and prepare to offer testimony if the Legislature may then gut and replace the bill with an entirely new one.  Such an interpretation of the three readings requirement would not only defeat its purpose, it would render the mid-session recess and the bill introduction deadline meaningless and reduce them to empty formalism.

As previously discussed, the final printing requirement was first added to the Hawaiʻi Constitution in 1968 and required a bill to be printed and made available for final

49

review at least twenty-four hours before a bill could pass third or final reading.  1 Proceedings of 1968, supra, at 216.  The final printing requirement was added to assure legislators had "an opportunity to take informed action on the final contents of proposed legislation[]" and to give "the public additional time and opportunity to inform itself of bills facing imminent passage."  Id.  In particular, the final printing requirement was added to address increasingly complex legislation and "highly technical" amendments.  Id.  The framing delegates believed that the final printing requirement and accompanying twenty-four-hour period would "enhance[] the functions served by" interest groups and the public in the legislative process. Id.

In 1978, the final printing requirement waiting period was increased to forty-eight hours in response to "the increasing numbers of bills being introduced in the legislature and the public concern expressed on the difficulty of following the many bills through the legislature in the closing days of the session[.]"  1 Proceedings of 1978, supra, at 603 (emphasis added).  The waiting period was increased to "help both legislator and constituent to avoid hasty decisions and surprises regarding the bill."  Id. (emphasis added).  In sum, the final printing requirement was added — and the time period

subsequently increased — to allow legislators, interest groups, and the public the opportunity to inform themselves of a bill's contents in its final form. The final printing requirement presumes that interested persons have been following a bill to see all of the amendments that have been made and raise concerns before the final vote. Consequently, we reject the State's argument that the Legislature may make non-germane amendments or introduce a substituted bill after first or second reading without violating the three readings requirement, so long as the bill passes third and final reading forty-eight hours later. This sequence of events excludes interested persons from the legislative process and deprives them of the opportunity to provide input to legislators. Moreover, a substituted bill passed in such a manner would be unlikely "to avoid hasty decisions" by legislators and "surprises" to constituents. See id.

The constitutional framers designed the legislative process with interdependent requirements of mid-session recess, bill introduction deadline, and final printing in order to allow the public to identify bills of interest, familiarize themselves with a bill's contents during the mid-session recess, provide meaningful input, and monitor their progress through enactment. These inter-dependent constitutional requirements all depend

upon a meaningful interpretation of the three readings requirement in order to effectuate their stated purposes.

Next, we address the State's remaining arguments against applying a germaneness standard to the three readings requirement.  The State argues that Mason's Manual, which was adopted as the parliamentary authority by both houses,[33] does not require the three readings to restart after a non-germane amendment to a bill.  The State selectively cites Mason's Manual, supra, § 722, which provides:

> 1.    The constitutional requirement that bills be read three times is not generally interpreted to apply to amendments, so that bills are required to be read the specified number of times after amendment, . . .
>
> 2.    When a bill that has been passed by one house has been materially amended in the other, and there passed as amended, it has been held that the constitutional provision with reference to reading three times does not require the bill as amended to be read three times in the house of origin before concurring in the amendments of the other house.

The State also cites Mason's Manual, supra, § 617 ¶ 1, which seemingly does not require the three readings to restart for substituted bills:

> A committee may recommend that every clause in a bill be changed and that entirely new matter be substituted as long as the new matter is relevant to the title and subject of the original bill.  A substitute bill is considered as an amendment and not as a new bill.

---

[33]    See Rules of the House of Representatives (2017-18), Rule 59; Rules of the Senate (2017-2018), Rule 88.
    While both chambers adopted Mason's Manual, they seem to overlook § 4 ¶ 4, which provides that "where the constitution requires three readings of bills, this provision controls over any provision of adopted rules, statutes, adopted manual or parliamentary law."  (Emphasis added.)

However, the State ignores other relevant sections of Mason's Manual which explicitly require that amendments are germane to a bill's original purpose. See Mason's Manual, supra, § 616 ¶ 3 ("There is no limit to the number of amendments that may be proposed to a bill as long as the amendments are germane to the original purpose of the bill. Amendments may be so numerous as to amount to a substitute version of the bill.") (emphasis added); § 617 ("A committee may recommend that every clause in a bill be changed and that entirely new matter be substituted as long as the new matter is relevant to the title and subject of the original bill.") (emphasis added); § 722 ¶ 3 ("Where a substituted bill may be considered as an amendment, the rule with reference to reading a bill on three separate days does not require the bill to be read three times after substitution.") (emphasis added); § 415 ¶ 2 ("Substitution is only a form of amendment and may be used, as long as germane, whenever amendments are in order.") (emphasis added).

In other words, Mason's Manual does not require the three readings to restart after a germane amendment, even if the amendment actually amounts to a substituted bill. However, Mason's Manual §§ 616 and 617 limit proposed committee amendments to those that are germane to the original purpose and subject of the bill and § 415 similarly limits non-germane floor

amendments.[34]  Additionally, Mason's Manual § 722 limits the exemption from restarting the three readings for a substituted bill to instances when the "substituted bill may be considered as an amendment[.]"  Thus, while Mason's Manual contains merely procedural rules that do not define the scope of Hawaiʻi's constitutional three readings requirement, even the Legislature's adopted rules of procedure do not support the State and Legislature's interpretation of the three readings requirement.

The State's hypothetical flood of litigation – as well as legitimate separation of powers concerns – are protected by the standard of review for voiding legislation, which shifts the

---

[34]  In this case, the non-germane hurricane shelter amendment was recommended by a committee.  H.R. Stand. Comm. Rep. No. 1255-18, at 2.  However, we note that the Senate's own rules of procedure require that "the fundamental purpose of any amendment shall be germane to the fundamental purpose of the bill."  Rules of the Senate (2017-18), Rule 54(2) (emphasis added).  Similarly, the House's rules require than any committee's substitute bill "shall be consistent with the subject of the bill or bills referred to the committee."  Rules of the House of Representatives (2017-18), Rule 11.7(4).

Contrary to the dissent's reading that Senate "Rule 54(2) appears to address only amendments proposed on the Senate floor," Dissent at 8 n.4, Senate Rule 54(2)'s use of "any amendment" is notable in light of Senate Rule 54(4) and (5)'s specification that those provisions apply to "floor amendment[s]."  (Emphasis added.)  "Where [the legislature] includes particular language in one section . . . but omits it in another section . . . , it is presumed that [the legislature] acts intentionally and purposely in the disparate inclusion or exclusion."  Russello v. United States, 464 U.S. 16, 23, 104 S. Ct. 296, 300 (1983).  Thus, in the absence of evidence to the contrary, we must presume that the Senate acted intentionally in articulating that Rule 54(2) applied to "any" amendment and in limiting Rule 54(4) and (5) to "floor" amendments.  See also United States v. Gonzales, 520 U.S. 1, 5, 117 S. Ct. 1032, 1035 (1997) ("Read naturally, the word 'any' has an expansive meaning[.]").

burden to a challenger to prove beyond a reasonable doubt that a law is unconstitutional.  See Schwab, 58 Haw. at 31, 564 P.2d at 139) ("[E]very enactment of the legislature is presumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt.").

While the Legislature might view gut and replace legislation as an effective and expedient bill amendment tool,[35] the constitutional history of the three readings requirement expresses a clear preference for deliberate and careful consideration of legislation and a process in which legislators have the opportunity for a full and open debate and interested persons have notice of proposed legislation and are able to provide input.  See 1 Proceedings of 1950, supra, at 183-84; 1 Proceedings of 1968, supra, at 216.

Rather than encouraging public participation in the legislative process, gut and replace discourages public confidence and participation.  The process used to enact

---

[35]    We note that the State argues on appeal that the Legislature used gut and replace in this instance to the "secure the timely passage of critically important public safety legislation."  However, the State represented to the circuit court that no exigency necessitated gutting the recidivism reporting bill and replacing it with the hurricane shelter bill.  In any event, even if an exigency did exist, the plain language of section 15 contains no emergency exception.  If there is an urgent need to pass legislation, "the legislature maintains the option of holding a special session[.]"  See Morita, 145 Hawai'i at 396, 453 P.3d at 216.

S.B. 2858 demonstrates how public participation diminishes when bills wind their way through the process and are drastically changed.  Here, numerous interested parties offered testimony largely in support of the recidivism reporting bill when it was in committee at the House, including the DPS, the Office of Hawaiian Affairs, the Ho'omanapono Political Action Committee, the Hawai'i Justice Coalition, the Community Alliance on Prisons, Young Progressives Demanding Action, the ACLU of Hawai'i, and private citizens.  However, after the bill was gutted and replaced with the hurricane shelter bill, just two of those parties — the Office of Hawaiian Affairs and Young Progressives Demanding Action — offered testimony asking legislators to revert the bill to its original subject as the recidivism reporting bill, to no avail.  The logical inference is that many of the other parties who had supported the recidivism reporting bill were not aware that it was gutted and replaced.  Alternately, persons who might have been interested in H.B. 2452, the hurricane shelter bill originally introduced in the House, also were likely unaware that the bill was inserted into

S.B. 2858 and consequently unable to provide input.[36]  Thus, gut and replace deprives the public of notice and an opportunity to submit testimony and is antithetical to the intent of the three readings requirement.

Understandably, the Legislature values its ability to be flexible and amend bills quickly to enact legislation. However, none of their proffered policy arguments change the fact that we must construe section 15 in the manner that the framers intended — so as to allow for meaningful public participation in the legislative process.

Accordingly, we conclude that a meaningful interpretation of the constitutional three readings provision requires that the three readings begin anew after a non-germane amendment changes the object or subject of a bill so that it is no longer related to the original bill as introduced.

### 3.    **Act 84 did not receive three readings in each house**

Having concluded that a meaningful interpretation of section 15 requires the three readings to begin anew after a

---

[36]    Interested person can request to follow certain bills by subscribing to the Legislature's Really Simple Syndication (RSS) feed.  Hawai‘i State Legislature, RSS, https://www.capitol.hawaii.gov/rss.aspx.  The RSS feed will send the subscriber a notification when new content is available on a particular bill of interest.  Id.  However, the RSS feed will only notify subscribers if there is new content available for the bill of interest.  Id. If the bill does not progress and another bill is later gutted to include the subject that the subscriber was interested in, the subscriber is not notified and thus loses the opportunity to provide input.

non-germane amendment, we next consider whether the process used to enact Act 84 complied with section 15.

The original subject of S.B. 2858 was recidivism reporting and the recidivism reporting bill passed three readings in the Senate.  Next, the recidivism reporting bill passed its first reading in the House.  Prior to the second reading, the House amended the bill by deleting its contents and inserting provisions which would require that newly constructed State buildings include hurricane shelter space.  Thus, as a hurricane shelter bill, S.B. 2858 passed its second reading in the House.  Based on the recommendation of a conference committee, S.B. 2858 was amended to instead require the State to consider hurricane resistant criteria when designing and constructing new schools.  In this final form, S.B. 2858 passed final reading in both chambers and was signed into law as Act 84.

Applying the germaneness standard adopted by this court in Kua, we must consider whether the hurricane shelter amendment was germane to the original recidivism reporting bill. We conclude that there is no "common tie" or "close alliance" between the recidivism reporting bill and the hurricane shelter bill.  See Kua, 22 Haw. at 313 (defining germaneness in the context of legislative provisions as a "common tie" or "close

alliance"). By amending the recidivism reporting bill to introduce the subject of hurricane shelters, "a new and independent matter, disconnected from the question" of recidivism reporting, the House made a non-germane amendment to S.B. 2858. See id. at 313. As a result, section 15 requires that the three readings restart after the hurricane shelter amendment. Because the hurricane shelter version of the bill only received one reading in the Senate before it passed, the process used to enact Act 84 violated section 15 and the violation was "plain, clear, manifest, and unmistakable." See Schwab, 58 Haw. at 31, 564 P.2d at 139. For that reason, Act 84 is void.[37] See id. (noting that a violation of a constitutional provision regarding the enactment of legislation "would render an enactment nugatory.").

When considering whether the process used to enact Act 84 complied with the three readings requirement, the circuit court based its decision on the Legislature's own rule of procedure. The circuit court concluded that, because S.B. 2858

---

[37] However, applying the germaneness standard to the conference committee amendment, we conclude that there is a "common tie" and "close alliance" between hurricane shelters in newly constructed State buildings and hurricane resistant material for new schools. See Kua, 22 Haw. at 313. By amending the hurricane shelter bill to introduce the subject of hurricane resistant material for new schools, the conference committee did not introduce "a new and independent matter[.]" See id. at 313. Thus, the hurricane resistant material amendment was germane to the previous version of the hurricane shelter bill.

had three readings according to sections 617 and 722 of Mason's Manual, it also satisfied the constitutional three readings requirement.

The Legislature is empowered by section 12 to enact its own rules of procedure, which are entitled to deference. However, the authority to adopt its own procedural rules does not authorize the Legislature to redefine the constitutional three readings requirement. See Peer News, 138 Hawai'i at 66-67, 376 P.3d at 14-15 (holding that the constitutional mandate directing the Legislature to "take affirmative steps to implement" the constitutional privacy right does not mean that it is the Legislature's "exclusive role to define" that right) (internal quotation marks omitted). The power to interpret the Hawai'i Constitution still lies with the judiciary. Sierra Club, 120 Hawai'i at 196, 202 P.3d at 1241 ("[T]he courts, not the legislature, are the ultimate interpreters of the Constitution.") (internal quotation marks and citations omitted). Moreover, if the Legislature could alter the meaning of the Hawai'i Constitution through its own rules of procedure, theoretically, there would be no need to go through the formality of amending the Hawai'i Constitution. See Mason's Manual, supra, § 12 ¶ 1 ("A legislative body cannot make a rule which evades or avoids the effect of a rule prescribed by the

constitution governing it, and it cannot do by indirection what it cannot directly do.").

Thus, we conclude that the circuit court erred by relying on the Legislature's own rules of procedure[38] to determine whether the Legislature complied with section 15's three readings requirement.

### 4. The new rule we announce here applies only to this case and prospectively

"The question of prospective application arises when this court announces a new rule." State v. Jess, 117 Hawai'i 381, 400, 184 P.3d 133, 152 (2008). "Although judicial decisions are assumed to apply retroactively, . . . '[t]he Constitution neither prohibits nor requires retrospective effect.'" State v. Ikezawa, 75 Haw. 210, 220, 857 P.2d 593, 597 (1993) (quoting State v. Santiago, 53 Haw. 254, 268, 492 P.2d 657, 665 (1971)). When a judicial decision announces a new rule, this court may, in the exercise of its discretion, determine that the interests of fairness preclude retroactive application. Santiago, 53 Haw. at 268, 492 P.2d at 665. Today, this court for the first time holds that section 15 requires the

---

[38] As previously noted, sections 415, 617, and 722 of Mason's Manual, see supra pp. 51-53, do not permit non-germane amendments for purposes of the three readings requirement. Thus, even if the Legislature's own rules of procedure could define compliance with the three readings requirement, the Legislature did not comply with sections 415, 617, and 722 in this case because the hurricane shelter amendment was not germane to the original subject of S.B. 2858, which was recidivism reporting.

three readings to begin anew after a non-germane amendment,
which constitutes a new rule.  Accordingly, we must determine
whether the germaneness standard should be given retroactive
effect and to what degree.[39]

In deciding whether to give a new rule retroactive
effect, this court must

> weigh the merits and demerits of retroactive application of
> the particular rule, in light of (a) the purpose of the
> newly announced rule, (b) the extent of reliance . . . on
> the old standards, and (c) the effect on the administration
> of justice of a retroactive application of the new
> standards[.]

---

[39]    In Lewi v. State, 145 Hawai'i at 349, 452 P.3d at 346 (2019), we
restated four alternatives for what degree of retroactive effect to give a
new rule:

> First, this court may give a new rule "purely prospective
> effect, which means that the rule is applied neither to the
> parties in the law-making decision nor to those others
> against or by whom it might be applied to conduct or events
> occurring before that decision."  [Jess, 117 Hawai'i at 401,
> 184 P.3d at 153.]  Second, this court may give a new rule
> "limited or 'pipeline' retroactive effect, under which the
> rule applies to the parties in the decision and all cases
> that are on direct review or not yet final as of the date
> of the decision."  Id.  Third, this court may give a new
> rule "full retroactive effect, under which the rule applies
> both to the parties before the court and to all others by
> and against whom claims may be pressed."  Id.  Lastly, this
> court has recognized a fourth alternative, in which a new
> rule is given "selective retroactive effect," meaning the
> court applies the new rule "in the case in which it is
> pronounced, then return[s] to the old [rule] with respect
> to all [other cases] arising on facts predating the
> pronouncement."  117 Hawai'i at 401 n.19, 184 P.3d at 153
> n.19.

(Cleaned up.)  We have declined to apply selective retroactive effect in
criminal cases because "selective application of new rules violates the
principles of treating similarly situated defendants the same."  Jess, 117
Hawai'i at 401 n.19, 184 P.3d at 153 n.19 (internal quotation marks and
citations omitted).

Jess, 117 Hawaiʻi at 401-02, 184 P.3d at 153-54 (cleaned up).

The purpose of weighing these factors is to evaluate whether according retrospective application to a new rule would result in substantial prejudice. Id. at 403, 184 P.3d at 155. "Where substantial prejudice results from the retrospective application of new legal principles to a given set of facts, the inequity may be avoided by giving the guiding principles prospective application only." Catron v. Tokio Marine Mgmt., Inc., 90 Hawaiʻi 407, 411, 978 P.2d 845, 849 (1999) (quoting State v. Ikezawa, 75 Haw. 210, 220‑21, 857 P.2d 593, 598 (1993) (footnote omitted)).

Regarding the first factor to be weighed, the purpose of the newly announced rule, retrospective application is most appropriate when the new rule is aimed at protecting the integrity of the factfinding process, particularly in criminal proceedings. Jess, 117 Hawaiʻi at 402, 184 P.3d at 154. In this case, the germaneness standard we announce today is intended to effectuate the purpose of the three readings requirement – ensuring public participation in the legislative process, rather than protecting the integrity of factfinding in judicial proceedings. Consequently, the purpose of the new rule does not weigh in favor of according it retrospective effect.

The second factor to be weighed is the extent of the

Legislature's reliance on its previously accepted practice. See id. at 401-02, 184 P.3d at 153-54. The Legislature has long relied on its own rules of procedure, which do not require the three readings to begin anew after a non-germane amendment. Obviously, the Legislature has relied on these same procedural rules to pass other bills which similarly would not have had three readings in each house after a non-germane amendment. Accordingly, the extent of the Legislature's reliance on its previously accepted practice of permitting non-germane amendments without requiring the three readings to begin anew weighs in favor of limiting our decision to purely prospective application.

Finally, we must consider the effect that retrospective application of the new rule would have. See id. at 402, 184 P.3d at 154. While the appropriate consideration in this case is not the effect on the administration of justice, see id., we instead must consider whether the State and the Legislature would suffer substantial prejudice if the germaneness standard was given retroactive effect. See Catron, 90 Hawai'i at 411, 978 P.2d at 849. In this case, the retrospective application of the germaneness standard to the three readings requirement could render invalid other laws enacted in the 2019 and 2020 legislative terms if they are

challenged.  As a result, the State and the Legislature would suffer substantial prejudice from the retrospective application of the germaneness standard that we announce today.

In sum, the extent of the Legislature's reliance on its previously accepted practice and the substantial prejudice which the State and the Legislature would suffer counsel against according the germaneness standard full or pipeline retroactive effect.  Based on these two factors, we determine that the fourth alternative — selective retroactive effect — is most appropriate.  Thus, the new rule is applied to Petitioners in this case and prospectively, but not to other cases challenging laws enacted prior to this pronouncement.

## IV.  CONCLUSION

For the foregoing reasons, we vacate the circuit court's orders and judgment granting the State's motion for summary judgment.  Because we conclude that article III, section 15 of the Hawai'i Constitution requires that a bill receive three readings after the Legislature introduces a non-germane amendment and because the hurricane shelter provisions of Act 84 violated section 15, we vacate the summary judgment granted to the State and remand this case to the circuit court with instructions to grant Plaintiffs' motion for summary judgment.

Robert Brian Black
(Lisa Emily Engebretsen
with him on the briefs)
for plaintiffs-appellants
League of Women Voters
of Honolulu and Common Cause

Clare E. Connors
(Kimberly Tsumoto Guidry on the
briefs) for defendant-appellee
State of Hawai'i

Colleen Hanabusa for amicus
curiae Hawai'i State Legislature

Robert H. Thomas for amicus
curiae Grassroot Institute of
Hawaii

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Michael D. Wilson

